IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **CARL WAYNE BUNTION**, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:17-cv-02683 |
| | § | *CAPITAL CASE* |
| **LORIE DAVIS**, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| | § | |
| Respondent. | § | |

_____

_____

**Petition for a Writ of Habeas Corpus**
_____

**This is a death penalty case.**

David R. Dow
Texas Bar No. 06064900
Jeffrey R. Newberry
Texas Bar No. 24060966
University of Houston Law Center
4604 Calhoun Rd.
Houston, Texas 77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131

*Counsel to Carl Wayne Buntion*

# Table of Contents

Table of Contents.......................................................................2

Index of Authorities.................................................................7

Table of Exhibits....................................................................15

Petition for a Writ of Habeas Corpus .....................................16

Jurisdiction.............................................................................16

Prior Proceedings...................................................................17

Statement of the Case.............................................................20

Claims for Relief....................................................................23

I.    Buntion's rights pursuant to the Fourteenth Amendment's Due Process Clause were violated by the actions of the judge that presided over his 1991 trial because an objective observer would believe the judge's actions revealed there was an unacceptable risk he was biased.......................................23

    A.    The legal standard ................................................23

    B.    The relevant facts.................................................28

        1.    Proceedings convened on Buntion's motion to change venue.................................................28

        2.    Buntion's first motion to recuse....................29

        3.    Buntion's motion for mistrial........................32

        4.    Trial...... ........................................................37

    C.    Buntion is entitled to relief on this claim..............37

D.  This claim is procedurally viable. ........................................... 40

    1.  The claim presented here is not "second or successive" within the meaning of section 2244. ......... 40

    2.  If unexhausted, Buntion's claim is nevertheless procedurally viable. ....................................................... 42

    3.  The opinion issued by the Court of Appeals for the Fifth Circuit in Buntion's initial habeas proceedings is irrelevant to the claim in this proceeding ...................................................................... 45

II.  Buntion was denied his Sixth and Fourteenth Amendment right to a fair trial because extensive pretrial publicity rendered it impossible for an impartial jury to be seated in Harris County............................................................................... 49

    A.  The legal standard ................................................................. 49

    B.  The relevant facts.................................................................. 52

    C.  Buntion is entitled to relief on this claim............................. 54

III.  Buntion received ineffective assistance from trial counsel in violation of his rights under the Sixth Amendment. .................... 55

    A.  The legal standard ................................................................. 55

    B.  Trial counsel was ineffective for allowing Juror Kotsatos to serve on Buntion's jury. ...................................... 61

    1.  Kotsatos indicated she was biased during voir dire........................................................................... 61

2.      Buntion was prejudiced by trial counsel's failure to request that Kotsatos be struck from the jury panel. .................................................................. 64

C.    Trial counsel was ineffective for not conducting a neuropsychological evaluation on Buntion ........................... 67

1.      The relevant facts ........................................................ 67

2.      Post-conviction investigation reveals that Buntion suffers from memory deficits associated with Mild Cognitive Impairment. .................................. 68

3.      Trial counsel's failure to discover Buntion's memory problems and Mild Cognitive Impairment constituted deficient performance. .......... 73

4.      Trial counsel overlooked specific evidence that neuropsychological testing should have been administered to Buntion ................................................ 73

5.      Professional standards required investigation of Buntion's neuropsychological condition. ...................... 75

6.      There is a reasonable probability the jury's verdict would have been different had trial counsel presented evidence of Buntion's Mild Cognitive Impairment. ................................................ 77

D.    Trial counsel was ineffective for failing to present individualized evidence that there was not a probability that Buntion would commit future acts of violence… ................................................................... 79

1.      The relevant facts ........................................................ 79

2.      Age and physical condition ........................................... 80

3.     Institutionalization .......................................................82

4.     Trial counsel failed to present individualized evidence that Buntion was not likely to commit acts of violence. ...............................................83

E.    Buntion received ineffective assistance of counsel when trial counsel failed to mitigate evidence regarding Buntion's alleged gang membership. .....................................86

1.     Evidence presented of Buntion's alleged gang membership ...................................................86

2.     Trial counsel failed to present evidence to mitigate the impact of testimony about Buntion's alleged prison gang membership, prejudicing his trial……….. ...................................................88

F.    Buntion was prejudiced by the cumulative effect of trial counsel's deficiencies. .....................................91

IV.   Buntion's death sentence is arbitrary, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, because the punishment is based on the jury's unreliable speculation about his future behavior, which has subsequently been proved false. ....................................92

A.    Evidence now confirms that predictions of future dangerousness are inherently unreliable. .............................92

B.    Evidence demonstrates that Buntion's jury was wrong..... 101

C.    This claim is exhausted. .......................................102

V.   Buntion's death sentence is unconstitutional because his ability to investigate and present mitigation evidence was impeded by the original unconstitutional jury instruction that necessitated his punishment retrial. ....................................103

A. To impose the death penalty, a jury must be given the opportunity to meaningfully weigh an individual's character and background. ....................................................... 103

B. The constitutional error that required reversal of Buntion's sentence was not solved by Buntion's punishment retrial, but was instead compounded by the significant time that had elapsed. ................................. 105

C. This Court should find Buntion is entitled to an evidentiary hearing to develop factual support for this claim…………….................................................................... 108

VI. The penological objectives of the Eighth Amendment cannot be squared with the execution of a prisoner whose cognitive decline leaves him without a memory of the commission of the crime…………….................................................................110

VII. Because he has been incarcerated on death row for over a quarter of a century, the Eighth Amendment will not permit Buntion's execution. .................................................... 111

Conclusion and Prayer for Relief ........................................... 114

Verification………………. ........................................................ 115

Certificate of Service………….. .............................................. 115

# Index of Authorities

## Cases

*Buntion v. Dretke*,
No. 4:04-cv-01328 (S.D. Tex. Dec. 30, 2004) ................................... 18

*Buntion v. Quarterman*,
524 F.3d 664 (5th Cir. 2008) ............................................... 18, 25, 46

*Buntion v. State*,
482 S.W.3d 58 (Tex. Crim. App. 2016) .........................10, 54-55, 102

*Buntion v. State*,
No. AP-71,238, 1995 Tex. Crim. App. Unpub. LEXIS 2 (Tex.
Crim. App. May 31, 1995) .....................................................17, 38-39

*Buntion v. Texas*,
136 S. Ct. 2521 (2016) ...................................................................... 19

*Caperton v. A.T. Massey*,
556 U.S. 868 (2009) ......................................................23-26, 28, 40

*Chambers v. Florida*,
309 IU.S. 227 (1940) ......................................................................... 50

*Charles v. Stephens*,
736 F.3d 380 (5th Cri. 2013) ........................................................... 48

*Coble v. State*,
330 S.W.3d 253 (Tex. Crim. App. 2010) ...............................83, 95-96

*Conner v. Sellers*,
136 S. Ct. 2440 (2016) ................................................................... 112

*Cullen v. Pinholster*,
563 U.S. 170 (2011) .......................................................................... 73

*Deal v. United States*,
    508 U.S. 129 (1993) ........................................................ 41

*Ellege v. Florida*,
    525 U.S. 944 (1988) ...................................................... 113

*Estes v. Texas*,
    381 U.S. 532 (1965) ..................................................51-52

*Ex parte Buntion*,
    No. WR-22,548-04 (Tex. Crim. App. June 7, 2017) ..........20, 67, 108

*Ex parte Buntion*,
    No. AP-76,236, 2009 WL 3154909 (Tex. Crim. App. Sept. 30,
    2009)……………………… .........................................19, 105

*Ex parte Buntion*,
    No. WR-22,548-02 (Tex. Crim. App. Nov. 5, 2003)........................ 17

*Ex parte Franks*,
    71 S.W.3d 327 (Tex. Crim. App. 2001) .......................................... 54

*Ford v. Wainwright*,
    477 U.S. 399 (1986) ..................................................110-11

*FTC v. Cement Inst.*,
    333 U.S. 683 (1948) ........................................................ 23

*Furman v. Georgia*,
    408 U.S. 238 (1972) ..................................................112-13

*Green v. Thaler*,
    699 F.3d 404 (5th Cir. 2012) ........................................... 48

*Gregg v. Georgia*,
    428 U.S. 153 (1976) ..............................................110, 112

*In re Brown,*
     594 F. App'x 726 (3d Cir. 2014) ...................................................... 41

*In re Lampton,*
     667 F.3d 585 (5th Cir. 2012) ........................................................ 42

*In re Murchison,*
     349 U.S. 133 (1955) ...............................................................23-25

*Irvin v. Dowd,*
     366 U.S. 717 (1961) .................................................................. 49

*Johnson v. Mississippi,*
     486 U.S. 578 (1988) ................................................................ 101

*Johnson v. United States,*
     623 F.3d 41 (2d Cir. 2010)......................................................... 41

*Jurek v. Texas,*
     428 U.S. 262 (1976) .................................................................. 92

*Lackey v. Texas,*
     514 U.S. 1045 (1995) ...........................................................111-12

*Little v. State,*
     758 S.W.2d 551 (Tex. Crim. App. 1988) ......................................... 65

*Lockett v. Ohio,*
     438 U.S. 586 (1978) ................................................................ 103

*Magwood v. Patterson,*
     561 U.S. 320 (2010) .............................................................40-41

*Martin v. Beto,*
     397 F.2d 741 (1968) .................................................................. 51

*Mayola v. Alabama,*
     623 F.2d 992 (5th Cir. 1980) ..................................................51-52

*Moore v. Dempsey*,
261 U.S. 86 (1923).............................................................. 50

*Murphy v. Florida*,
421 U.S. 794 (1975) ........................................................... 51

*Pamplin v. Mason*,
364 F.2d 1 (5th Cir. 1966) ................................................. 50

*Panetti v. Quarterman*,
551 U.S. 930 (2007) ...................................... 41, 78, 110-11

*Penry v. Johnson*,
532 U.S. 782 (2001) ................................................... 104-05

*Rideau v. Louisiana*,
373 U.S. 723 (1963) .......................................................... 50

*Rompilla v. Beard*,
545 U.S. 374 (2005) .......................................................... 89

*Sheppard v. Maxwell*,
384 U.S. 333 (1966) ...................................................... 50-51

*Smith v. Arizona*,
552 U.S. 985 (2007) ........................................................ 112

*Strickland v. Washington*,
466 U.S. 668 (1984) ................................... 55-56, 58, 60, 91

*Trop v. Dulles*,
356 U.S. 86 (1958)........................................................... 113

*Trottie v. Stephens*,
720 F.3d 231 (5th Cir. 2013) ........................................... 48

*Tumey v. Ohio*,
    273 U.S. 510 (1927) ................................................................ 23, 49

*Valle v. Florida*,
    132 S. Ct. 1 (2011) ......................................................................... 112

*Von January v. State*,
    576 S.W.2d 43 (Tex. Crim. App. 1978) ........................................... 66

*Wainwright v. Witt*,
    469 U.S. 412 (1985) ......................................................................... 64

*Wentzell v. Neven*,
    674 F.3d 1124 (9th Cir. 2012) ......................................................... 42

*Williams v. Pennsylvania*,
    136 S. Ct. 1899 (2016) ......................................................... 27-28, 37

*Williams v. State*,
    565 S.W.2d 63 (Tex. Crim. App. 1978) ........................................... 65

*Williams v. Taylor*,
    529 U.S. 362 (2000) ......................................................................... 57

*Wilson v. Sellers*,
    138 S. Ct. 1188 (2018) ..................................................................... 48

*Withrow v. Larkin*,
    421 U.S. 35 (1975)............................................................... 24, 26, 40

*Woodson v. North Carolina*,
    428 U.S. 280 (1976) ................................................................. 103-04

## Rules and statutes

28 U.S.C. § 2254............ .....................................................................38

Tex. Code Crim. Proc. art. 11.071......................................................... 109

Tex. Code Crim. Proc. art. 31.01 ................................................................51

Tex. Code Crim. Proc. art. 35.16 ...............................................................64

Tex. Code Crim. Proc. art. 37.0711 .......................................................59-60

## Other authorities

Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003) ..............65, 75-76

B. Jaye Anno et al., *U.S. Dept. of Justice, Nat'l Inst. of Corr., Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004) ................................. 80

Brittany Fowler, *A Shortcut to Death: How Texas Death-Penalty Statute Engages the Jury's Cognitive Heuristics in Favor of Death*, 96 Tex. L. Rev. 379 (2017) ......................................................... 94

Carla Edmondson, *Nothing is Certain But Death: Why Future Dangerousness Mandates Abolition of the Death Penalty*, 20 Lewis & Clark L. Rev. 857 (2016) ........................................................ 99

Christopher Slobogin, *Dangerousness and Expertise*, 133 U. Pa. L. Rev. 97 (1984) ........................................................ 100

Craig Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation*, 35 Santa Clara L. Rev. 547 (1995)………………………..................................................... 76

Douglas S. Liebert & David V. Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 Am. J. Forensic Psychiatry 43 (1994) ................................................. 76

Grant Morris, *Defining Dangerousness: Risking A Dangerous Definition*, 10 J. Contemp. Legal Issues 61 (1999) ............................... 100

Irene Merker Rosenberg, Yale L. Rosenberg & Bentzion S. Turin, *Return of the Stubborn and Rebellious Son: An Independent Sequel on the Prediction of Future Criminality*, 37 Brandeis L.J. 511 (1998-99)… ...................................................................... 100

James W. Marquart & Jonathan R. Sorensen, *A National Study of the Furman-Commuted Inmates: Assessing the Threat to Society from Capital Offenders*, 23 Loy. L.A.L. Rev. 5 (1989) ........................96-97

James W. Marquart, Sheldon Ekland-Olson & Jonathan Sorensen, *Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 Law & Soc'y Rev. 449 (1989).......95

Jeffrey L. Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 Wm. & Mary Bill Rts. J. 345 (1998)..................................... 100

Jessica L. Roberts, Note, *Futures Past: Institutionalizing the Re-Examination of Future Dangerousness in Texas Prior to Execution*, 11 Tex. J.C.L. & C.R. 101 (2006).........................................................99-100

Joan Cheever, Back from the Dead (Wiley 2006) ...................................97

John F. Edens, et al., *Predicitions of Future Dangerousness in Capital murder Trials: Is it Time to "Disinvent the Wheel?,"* 29 Law & Hum. Behav. 55 (2005).................................................................. 94

John Monahan, *The Prediction of Violent Behavior: Toward a Second Generation of Theory and Policy*, 141 Am. J. Psychiatry 10 (1984)……….. ..................................................................................92-93

Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. Crim. L. & Criminology 1251 (2000) .................................................. 93, 97

Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223 (2009)......................... 98

Mark David Albertson, *Can Violence Be Predicted? Future Dangerousness: The Testimony of Experts in Capital Cases*, 3 Crim. Just., Winter 1989 ........................................................................ 100

Sheri Lynn Johnson, *Buck v. Davis From the Left*, 15 Ohio St. J. Crim. L. 247 (2017) .................................................................... 96

Stephen P. Garvey, *"As the Gentle Rain from Heaven": Mercy in Capital Sentencing*, 81 Cornell L. Rev. 989 (1996) ............................... 100

Steven G. Gey, *Justice Scalia's Death Penalty*, 20 Fla. St. L. Rev. 67 (1992)……........................................................................ 100

Thomas J. Reidy, Jon R. Sorensen & Mark D. Cunningham, *Probability of Criminal Acts of Violence: A Test of Jury Predictive Accuracy*, 31 Behav. Sci. L. 286 (2013) .................................................98-99

William W. Berry III, *Ending Death by Dangerousness: A Path to the De Facto Abolition of the Death Penalty*, 52 Ariz. L. Rev. 889 (2010)…………………………… .............................................................. 100

## Table of Exhibits

Exhibit 1          Affidavit of Anthony Graves

Exhibit 2          Affidavit of William R. Kelly

Exhibit 3          Affidavit of James G. Underhill

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **CARL WAYNE BUNTION**, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action N. 4:17-cv-02683 |
| | § | *CAPITAL CASE* |
| **LORIE DAVIS**, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| | § | |
| Respondent. | § | |

_____

_____

**Petition for a Writ of Habeas Corpus**
_____

**This is a death penalty case.**

Petitioner Carl Wayne Buntion asks this Court to issue a writ of
habeas corpus and grant him relief from his unconstitutional conviction
and death sentence.

**Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. § 2241(d)
because Buntion was convicted in the 178th District Court in Harris

County, Texas. Subject matter jurisdiction is conferred by 28 U.S.C. §
2254.

## Prior Proceedings

Carl Wayne Buntion was convicted of the capital murder Houston
Police Department Officer James Irby in Harris County on January 17,
1991 and sentenced to death on January 24, 1991. 61 1991 R.R. 945; 64
1991 R.R. 620-21.[1] The Texas Court of Criminal Appeals (CCA) affirmed
his conviction and sentence on May 31, 1995. *Buntion v. State*, No. AP-
71,238, 1995 Tex. Crim. App. Unpub. LEXIS 2 (Tex. Crim. App. May 31,
1995). Buntion filed his initial state application for a writ of habeas
corpus with the convicting court on October 21, 1996. The convicting
court entered its finding and recommended relief be denied on
September 29, 2003, and the CCA adopted those findings and denied
relief on November 5, 2003. *Ex parte Buntion*, No. WR-22,548-02 (Tex.
Crim. App. Nov. 5, 2003).

Buntion then sought federal review of his conviction and sentence
in this Court, filing his amended petition for a writ of habeas corpus on

---

[1] Citations to the Reporter's Record in *State v. Buntion*, No. 3149 (216th Dist.
Ct., Gillespie County, Tex. Jan. 24, 1991), are cited herein as [volume number] 1991
R.R. [page number].

December 30, 2004. *Buntion v. Dretke*, No. 4:04-cv-01328, ECF No. 23 (S.D. Tex. Dec. 30, 2004), ECF No. 23. Buntion's then-counsel raised thirty-eight claims for relief to this Court. The majority of these were concerned with whether Buntion's right to due process had been violated by the trial court's presumptive bias. With respect to these claims, this Court found Buntion's right to due process had been violated, that the CCA's decision denying relief involved an unreasonable application of federal law and was based on an unreasonable determination of the facts, and that Buntion was entitled to relief. Mem. & Order, *Buntion v. Dretke*, No. 4:04-cv-01328 (S.D. Tex. Apr. 28, 2006), ECF No. 42. Without reaching  the merits of Buntion's due process claim, the United States Court of Appeals for the Fifth Circuit subsequently vacated the portion of this Court's order granting Buntion relief, reasoning that there was no basis under federal law "for finding that the state court's *ultimate determination* is objectively unreasonable." *Buntion v. Quarterman*, 524 F.3d 664, 671 (5th Cir. 2008) (emphasis added).

   After initial federal habeas proceedings had concluded, Buntion raised a claim pursuant to *Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry*

II), in the state habeas court. *Ex parte Buntion*, No. AP-76,236, 2009 WL 3154909, at *1 (Tex. Crim. App. Sept. 30, 2009). The CCA granted relief on Buntion's *Penry* II claim, holding that the "nullification instruction given to [Buntion's] jury was not a sufficient vehicle to allow jurors to give meaningful effect to the mitigating evidence presented" at his 1991 trial; the CCA therefore remanded Buntion's case to the trial court for a new punishment hearing. *Id*. at *2.

New trial proceedings commenced on February 21, 2012, and on March 6, 2012, Buntion was again sentenced to death. 45 R.R. 38.[2] The CCA affirmed his sentence on January 27, 2016, *Buntion v. State*, 482 S.W.3d 58 (Tex. Crim. App. 2016), and his case became final when the Supreme Court denied his petition for a writ of certiorari on June 27, 2016, *Buntion v. Texas*, 136 S. Ct. 2521 (2016).

Prior to the date on which the judgment sentencing Buntion to death became final, Buntion properly filed a state habeas application pursuant to Article 11.071 of the Texas Code of Criminal Procedure. However, without first affording Buntion any opportunity to introduce

---

[2] Citations to the Reporter's Record in *State v. Buntion*, No. 588227 (178th Dist. Ct., Harris County, Tex. Mar. 6, 2012), are cited herein as [volume number] R.R. [page number]. Citations to the Clerk's Record of these proceedings are cited herein as [volume number] C.R. [page number].

evidence in support of his claims, the trial court entered its findings of fact and conclusions of law recommending relief be denied on August 30, 2016. State's Proposed Findings of Fact, Conclusions of Law & Order, *Ex parte Buntion*, No. 588227-C (178th Dist. Ct., Harris County, Tex. Aug. 30, 2016). Based on the trial court's findings and conclusions and its own review, the CCA denied Buntion relief on June 7, 2017. *Ex parte Buntion*, No. WR-22,548-04 (Tex. Crim. App. June 7, 2017).

This Court appointed undersigned counsel to represent Buntion in these proceedings on September 18, 2017. Order, *Buntion v. Davis*, No. 4:17-cv-02683 (S.D. Tex. Sept. 18, 2017).

## Statement of the Case

The words and conduct of the trial judge who presided over Carl Buntion's 1991 capital murder trial would have led a reasonable, objective observer to believe the risk that he was biased against Buntion was too great for the Constitution to tolerate. For example, the judge said he believed that by presiding over the proceedings that would result in Buntion's being sentenced to death, he was doing "God's work." Because it is impossible to determine the degree to which the trial court's actions are responsible for Buntion's being convicted of the

capital murder of Houston Police Department Officer James Irby and subsequently sentenced to death, Buntion should be ganted a new trial.

Ten years after Buntion was sentenced to death, the Supreme Court held the special issues his jurors had to answer in determining his sentence at his 1991 trial did not allow the jurors to give the proper effect to the mitigating evidence presented at trial. Nine years after that, Texas' highest criminal court ordered the trial court to give Buntion a new sentencing trial. By the time the new trial proceedings commenced, over twenty years had passed since Buntion's original trial. Vital life history records had been destroyed. Most of the people who knew him as a child had forgotten about him or had died. As a result, the case for mitigation presented to his 2012 jury fell woefully short of what could have been presented at trial in 1991 had the special issues in use at that time allowed Buntion's jurors to give proper effect to mitigating evidence.

Despite the inherent difficulties created by the passage of time, there were things his 2012 attorneys could have done, but neglected to do, which likely would have led to Buntion's being sentenced to life in prison instead of to death. Despite knowing that in 1991 Buntion

already had begun experiencing cognitive difficulties, his trial attorneys failed to have Buntion examined by a neuropsychologist while preparing for his 2012 retrial. Had they employed such an expert, the jury could have learned that Buntion has mild cognitive impairment, which will likely result in his suffering from Alzheimer's disease. It is reasonably probable this information would have led Buntion's jury to decide he was not a future danger or there were sufficient mitigating circumstances to warrant sentencing him to life instead of death, or both. Because his attorneys were ineffective, his jury was presented no such evidence.

Buntion has now spent twenty-seven years incarcerated under a sentence of death. It is likely his cognitive functioning will continue to decline to the point where he could soon be unable to recall any of the events that resulted in his being sentenced to death. Because of this, his execution would serve neither of the two acceptable purposed of the death penalty.

Seeking relief from his unconstitutional conviction and sentence, Buntion now files this Petition for a Writ of Habeas Corpus.

**Claims for Relief**

I.  **Buntion's rights pursuant to the Fourteenth Amendment's Due Process Clause were violated by the actions of the judge that presided over his 1991 trial because an objective observer would believe the judge's actions revealed there was an unacceptable risk he was biased.**

   A.  **The legal standard**

"A fair trial in a fair tribunal is a basic requirement of due process," *In re Murchison*, 349 U.S. 133, 136 (1955). Although most matters related to judicial disqualification do not rise to a constitutional level, *see, e.g.*, *FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948), the Due Process Clause *does* require recusal in extraordinary situations. *Caperton v. A.T. Massey*, 556 U.S. 868, 887 (2009). *Caperton*, decided well before the date on which Buntion's case became final, stressed that a judge must recuse himself if he is actually biased – i.e. "when he has 'a direct, personal, substantial, pecuniary interest' in a case." *Caperton*, 556 U.S. at 876 (*quoting Tumey v. Ohio*, 273 U.S. 510, 523 (1927)).

A brief history of the decisions leading to *Caperton* reveals how Buntion's right to due process was violated in this case. Beginning with the 1927 case of *Tumey v. Ohio*, the Supreme Court  recognized the Due Process Clause might require recusal even in those cases where a judge

23

did not have an "actual bias," as that term was defined by the common law; rather, recusal was compelled in all cases where the "'probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Caperton*, 556 U.S. at 877 (*quoting Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

In *Tumey*, the Court addressed the case of a mayor-judge whose salary was paid from the fines assessed in the cases which he adjudicated. Under the common law prohibition against actual bias, this pecuniary interest alone would have required his recusal. However, the Court found his interest in the city's benefiting from the assessment of the fines to be another reason the Due Process Clause required his recusal. *Caperton*, 556 U.S. at 878. Of course, while the mayor/judge's interest in the city's benefiting was not "actual bias," as the term was understood in the common law, it was nevertheless a pecuniary interest which mandated recusal.

Next, in *In re Murchison*, 349 U.S. 133 (1955), the Supreme Court addressed the issue of whether a judge could preside over the case of a defendant in a proceeding for which the judge had been the person who had made the decision to charge that defendant with a crime, having

24

acted as a one-man grand jury. Stating that "no man can be a judge in his own case," the Supreme Court held that the Due Process Clause required the judge's disqualification. *Caperton*, 556 U.S. at 880 (*quoting In re Murchison*, 349 U.S. 133, 136 (1955)).

Prior to the Supreme Court's *Caperton* decision in 2009, *Tumey* and *Murchison* addressed the only scenarios in which the Court had found the Due Process Clause requires disqualification. *Caperton*, 557 U.S. at 891 (Roberts, C.J., dissenting) (noting that prior to issue its decision in *Caperton*, the Court had "identified only *two* situations in which the Due Process Clause requires disqualification of a judge: when the judge has a financial interest in the outcome of the case, and when the judge is presiding over certain types of criminal contempt proceedings"); *see also Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008). The constitutional landscape changed, however, in 2009.

In *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), the Court was confronted with the question of whether the Due Process Clause required the disqualification of a judge when the chairman of the Board of a corporate defendant had been the primary donor to that judge's political campaign. *Caperton*, 557 U.S. at 873. Answering that

question in the affirmative, the *Caperton* Court articulated the

constitutional rule: Under *Caperton*, when there exists a probability of

bias, the Due Process Clause requires disqualification. *Id.* at 887.

Whether this probability of bias exists is to be determined through an

objective inquiry that "asks not whether the judge is actually or

subjectively biased, but whether the average judge in his position is

'likely' to be neutral, or whether there is an unconstitutional 'potential

for bias.'" *Id.* at 881. *Caperton* made clear that an appellate court must

employ this objective standard rather than relying on an inquiry as to

whether the judge believed he was biased. *Id.* at 883-84. While the

dissenting justices viewed *Caperton* as being a significant departure

from the Court's prior precedent, *see id.* at 891, the majority explained

that the Court had made clear by 1975 that the Due Process Clause

requires recusal when the probability of actual bias is too high to be

constitutionally tolerable and that the inquiry into a possible violation

of due process was an objective – not subjective – one. *Id.* at 872

(*quoting Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

      While *Caperton* unequivocally made clear the Due Process Clause

required recusal in situations not controlled by the common law,

*Tumey*, or *Murchison*, *Caperton* did of course arise in a factual context that arguably involved a pecuniary interest. It is therefore possible to read *Caperton* in such a way as to find that, even after it was handed down, the Supreme Court had still only found the Due Process Clause to require disqualification in cases where the judge had a pecuniary interest or had served as a one-man grand jury in the case. However, this narrow interpretation of the Supreme Court's recusal jurisprudence was revealed to be untenable when the Court handed down its decision in *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016). In *Williams*, the Court examined whether the Due Process Clause required a judge to recuse himself from post-conviction proceedings brought by a death-sentenced man challenging his sentence, when that same judge had previously been the district attorney who made the ultimate decision to seek the death-penalty against Williams. *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1903 (2016). The Court held that the judge's failure to recuse himself violated Williams' right to due process because the judge's personal involvement in the case "gave rise to an unacceptable risk of actual bias." *Id.* at 1908. The Court's opinion makes clear that question to be asked is "not whether a judge harbors an actual,

subjective bias, but instead whether, as an objective matter, 'the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Id.* at 1905 (*quoting Caperton*, 556 U.S. at 881) (internal quotation marks omitted). The Court went on to find that Williams was entitled to relief notwithstanding that, as a member of a multi-judge panel, this particular judge's decision on Williams' appeal was not dispositive. *Id.* at 1909. The Court held that this type of error is not amenable to harmless error review because it is impossible to determine what effect the judge's bias had on deliberations, which are confidential. *Id.*

## B.   The relevant facts

### 1.   Proceedings convened on Buntion's motion to change venue

Judge William T. Harmon, then-judge of the 178th Judicial District of Harris County, presided over Buntion's 1991 trial, which proceeded in Gillespie County after the court granted Buntion's motion for a change of venue. During a hearing convened on the motion to change venue, the trial judge's conduct indicated that he had been affected by the extensive pre-trial media coverage. Judge Harmon's questions during the hearing were not aimed at gauging whether

28

Buntion would receive a fair trial in Harris County, but instead sought confirmation of his own belief that Buntion was guilty and should receive the death penalty. The judge noted that he personally believed that "the facts in this case are overwhelming." 8 1991 R.R 185.

Judge Harmon asked multiple local attorneys to speculate about whether Buntion would be found guilty and sentenced to death, irrespective of the extensive media coverage. *Id.* at 183-85. The judge asked not only if they believed that the media coverage in Houston would deny Buntion a fair trial but repeatedly asked them whether they thought Buntion was guilty and what penalty he should receive. *Id.* at 154-251. Judge Harmon's questions at this hearing demonstrate that he had already determined that the evidence against Buntion was overwhelming – that he had prejudged Buntion's guilt before a single witness was sworn or a single fact introduced.

## 2. Buntion's first motion to recuse

On December 11, 1990 (approximately one month before guilt phase proceedings commenced), Buntion filed his first motion to recuse Judge Harmon on the grounds that Harmon was biased and that the

Due Process Clause required his recusal. 1 1991 R.R 284-297.[3] Buntion alleged that the highly prejudicial and inflammatory media coverage (and not anything related to trial proceedings) had caused the trial judge to form an opinion about his guilt. *Id.* at 285-86. In the motion, Buntion listed several examples of Judge Harmon's behavior which demonstrated he was biased. First, Buntion recounted a statement Judge Harmon made off-the-record on December 5. On that day, in the presence of Buntion, his attorneys, counsel for the State, and court officials, the judge said, "I have been up here all day doing God's work to see that defendant Buntion gets executed." *Id.* at 288.

Second, Buntion alleged that on December 6, after defense counsel presented argument based on a recent decision from the CCA, Judge Harmon, again off-the-record, said that Judge Marvin Teague, the author of the CCA decision at issue, was an "idiot," and that judges of the CCA were "liberal bastards" because they expected him "to tell jurors that they can violate the law and change their 'yes' votes to 'no' votes just because they like the color of the defendant's tie." *Id.* at 289.

---

[3] Volume 1 of the Reporter's Record of the 1991 trial is actually the Clerk's record, which consists of ten volumes, numbered 1, 1-A, 1-B, 1-C, 1-D, 1-E, 1-F, 1-G, 1-H, and 1-I.

According to Buntion's motion, the judge also said applying the case to Buntion's trial was pointless because, even if his case was overturned on appeal as violating the recent decision, "sooner or later [Buntion] will be convicted, found guilty, and given the death sentence." *Id.*

Finally, Buntion's motion recounted that on December 6 Judge Harmon gave his trial attorneys an additional fifty peremptory strikes to use during voir dire. *Id.* at 290. Four days later, after defense counsel had begun to rely on the fifty additional peremptories, Judge Harmon took back forty of the strikes. *Id.* at 293.

The day after Buntion filed his motion, a hearing was convened on the motion at which the primary witness was Judge Harmon. With respect to his comment about his doing God's work, Judge Harmon admitted to making the statement but claimed the statement was not what he actually believed. 40 1991 R.R. 5301. Judge Harmon testified while he did not specifically remember calling the one CCA judge an "idiot" or referring to the judges as "liberal bastards," he admitted to having strong feelings about the opinion at issue. Specifically, Judge Harmon was concerned that of the six death-penalty trials over which he had presided and which resulted in defendants' being sentenced to

death, the convictions or sentences in four of the cases had been subsequently vacated by the CCA. *Id.* at 5303.

When questioned about whether had had formed an opinion about Buntion's guilt, Judge Harmon admitted he had but stated he would not let that opinion affect trial proceedings. *Id.* at 5304.

When asked about the fifty peremptories, Judge Harmon admitted he granted them out of his frustration with how slow the process of jury selection was going and in attempt to preclude Buntion's eventual conviction and sentence from being reversed on appeal. *Id.* at 5309-11.

The judge presiding over Buntion's motion to recuse denied Buntion's motion without explanation. 40 1991 R.R. 5354.

### 3.    Buntion's motion for mistrial

On January 8, 1991, Buntion's trial counsel filed a motion for mistrial. 1 1991 R.R. at 264-79. The motion largely repeated the allegations contained in the December motion to recuse but also included additional claims of judicial misconduct. For example, the motion alleged that Judge Harmon, during voir dire, in plain view of prospective jurors, had taped on the front of his bench a postcard of the infamous "hanging saloon" of the legendary "hanging judge" Roy Bean.

Judge Harmon had crossed through the words, "Judge Roy Bean: Law West of the Pecos" and wrote in the words, "Judge Bill Harmon: Law West of the Pedernales." *Id.* at 270.

The motion for mistrial also recounted that Judge Harmon – during jury selection – had attempted to remove lead trial counsel Philip Scardino from the case. *Id.* at 273-76. Multiple news articles in Houston, San Antonio, and Fredericksburg reported that Judge Harmon informed Mr. Scardino by telephone that he would be removed from Buntion's trial team. 52 1991 R.R. Judge Harmon ignored the requests to reinstate Scardino made by the remaining defense attorneys and, only after Johnny Holmes, then-Harris County District Attorney, approached Judge Harmon and requested that he reinstate Mr. Scardino, did Judge Harmon withdraw his decision. 1 1991 R.R 271. Holmes "was surprised by the judge's actions" and "could not think of anything Scardino might have done during jury selection that would prompt Harmon to remove him from the case." 52 1991 R.R. Def.'s Ex 12. Although Judge Harmon subsequently reinstated Scardino, he remained openly critical: "I'm still convinced, even more than before, that Mr. Scardino will engage in conduct to sabotage the trial." *Id.* at

Exhibit 10; *see also id.* at Exs. 15-16 ("I was just convinced, and I still am, that Mr. Scardino is going to try to disrupt the proceedings").

The extensive media coverage of the feud between Judge Harmon and Scardino was seen or heard by at least two jurors. These two jurors approached a court officer and asked whether the trial was going to continue given the Buntion's attorney lawyer had been removed for misconduct. 1 1991 R.R. 275.

On January 8, 1991, Judge Jordan presided over a hearing convened on Buntion's motion for mistrial, which had been construed as a second recusal motion. The first witness to testify was Judge Harmon. Regarding the issue of his granting fifty peremptory challenges and then subsequently taking forty of them away, Judge Harmon admitted to regularly engaging in *ex parte* communications with members of the Harris County District Attorney's Office and had consulted with member of that office on this issue. *Id.* at 7438-39.

Scardino questioned Judge Harmon about an incident that occurred on the evening of January 6:

> Q: Let me take you back to last Sunday night before we
> started jury selection again, which would be the early
> morning hours of January 7th or the late hours of January

the 6th in our return to Fredericksburg, Texas. Do you
remember that evening?

A: I do.

Q: Do you remember meeting Mr. Tanner [Scarino's co-
counsel at trial] at a convenient store around midnight that
Sunday night?

A: I do.

Q: Were in fact Mr. Keirnan [another co-counsel] and myself
also there?

A: You were.

Q: And is it also true that you waited until Mr. Keirnan and
myself were gone before you approached Mr. Tanner?

A: That's true.

Q: And did you in fact return to Mr. Tanner's hotel room
with him around midnight last Sunday night?

A: That's true.

Q: And did you in fact threaten Mr. Tanner and tell him that
if he filed any more motions or he made any more allegations
about your behavior or your presiding over this case that you
would say that there was dope over at the defense lawyers'
hotel and that you would bring in Judge Berchelmann to
finish the case and hear the case at that time?

A: No, that was not what I told him, but it's true that I
talked to Judge Berchelmann.

51 1991 R.R 7448-49. Scardino's co-counsel Keirnan also testified about the incident. He testified that Mr. Tanner told him that Judge Harmon did something "so strange" that "he couldn't believe it." *Id.* at 7475. Keirnan testified that Tanner's demeanor was "very upset, very agitated, very nervous, very distraught" and that the statements by Judge Harmon "caused serious concern between [Scardino] and I and Mr. Tanner about how we were going to proceed . . . we felt that it was our duty and responsibility as lawyers to bring this up, bring it to the court's attention, that we thought that undue pressure had been placed on co-counsel . . .." *Id.* at 7472-77.

Scardino then questioned Judge Harmon about his attempt to remove Scardino from Buntion's trial team on Christmas Eve. Judge Harmon claimed to have attempted to remove Scardino because he believed Scardino had harassed a prospective juror and feared he was planning to "sabotage" the trial. 51 1991 R.R 7450-54.

Judge Jordon, without deliberating, ruled that Judge Harmon did not possess the type of bias necessary for recusal; he refused to consider whether Judge Harmon had actually violated petitioner's rights. *Id.* at

36

7477-79. Judge Harmon subsequently denied the motion for mistrial.
*Id.* at 7488.

### 4.   Trial

During the guilt-innocence stage of the trial, defense counsel lodged fifty-nine objections. Judge Harmon denied or overruled all of these objections.

During the punishment stage, the court bailiff told a juror that he looked like he was "dressed to kill today." 64 1991 R.R. 605. Buntion's trial counsel asked the court to grant a mistrial based on the bailiff's statement, which the trial court denied.

### C.   Buntion is entitled to relief on this claim.

An objective, reasonable observer of Judge Harmon's actions and statements during Buntion's 1991 trial proceedings would believe the trial court's actions and statements indicated there was an unacceptable degree of risk that he was biased against Buntion. As the Supreme Court found to be true for the defendant in *Williams*, this is not the type of error that is amenable to harmless error review. *See Williams*, 136 S. Ct. at 1909. It is impossible to know the degree to which the jury was affected by the trial court's actions.

Buntion initially raised claims related to Judge Harmon's bias in the direct appeal proceedings that followed his 1991 trial.  To be entitled to relief in these federal habeas proceedings, Buntion must show that the state court's 1991 resolution of the due process claim was and is objectively unreasonable. As will be discussed below, the portion of the CCA's opinion which denied Buntion relief on his claims related to Judge Harmon's bias makes clear that the state court's decision "involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

First, the CCA's opinion denying relief relied on the explanation for Harmon's behavior offered during the hearing on Buntion's motion for recusal; that method of analysis was wrong. *See Buntion v. State*, No. AP-71,238, 1995 Tex. Crim. App. Unpub LEXIS 2, at *10-15, *19-24 (Tex. Crim. App. May 31, 1995) (quoting a significant portion of Judge Harmon's testimony from the hearing on Buntion's motion). As the Suprme Court has explained, the Constitution requires that the court reviewing the due process claim ask instead whether an objective observer would believe the judge's actions indicated there was an unacceptable risk of bias. So, for example, when confronted with the

question of whether Judge Harmon's statement that he believed he "was doing God's work" violated Buntion's right to due process, the court found Harmon's testimony that the comment was "made entirely in jest and did not reflect any genuine bias against" Buntion to be dispositive. *Id.* at *17. When confronted with the question of whether the postcard of Judge Roy Bean that Judge Harmon taped to the bench violated Buntion's right to due process, the court found Harmon's testimony that he had only displayed the postcard because an acquaintance gave it to him and that he believed "Bean to be 'a very important part of Texas lore'" to be dispositive. *Id.* at *25. With respect to whether Buntion's due process rights had been violated by Judge Harmon's granting and then taking back the additional peremptory challenges, the court found Harmon's testimony that "his action was intended to guarantee that [Buntion] would not have to accept any objectionable jurors" to be dispositive.

As these examples make clear, the CCA's 1995 opinion affirming Buntion's conviction and sentence reveal that court employed a subjective – and not objective – inquiry to determine whether Buntion's due process rights had been violated.  However, as the Supreme Court

made clear in *Caperton*, clearly-established federal law requires the inquiry into a possible due process violation to be an objective one. *Caperton*, 557 U.S. at 872 (*quoting Withrow*, 421 U.S. at 47 (1975)). The CCA's opinion also makes clear that court believed Buntion could only prevail on his claims related to Judge Harmon's bias if he proved the judge was actually biased. Supreme Court precedent is clear that a defendant need only demonstrate there to be a risk of actual bias. *Caperton*, 557 U.S. at 872 (*quoting Withrow*, 421 U.S. at 47 (1975)). The CCA's decision denying relief on the due process claim relating to Judge Harmon's actual, potential, or perceived bias is objectively unreasonable.

## D.   This claim is procedurally viable.

### 1.   The claim presented here is not "second or successive" within the meaning of section 2244.

In *Magwood v. Patterson*, the Supreme Court considered the question of whether a second federal habeas petition brought by a man whose first petition had resulted in his receiving a new sentencing trial was a "second or successive petition" under Section 2244(b) when the claims he raised in the second petition challenging his sentence could have been brought in his initial petition. *Magwood v. Patterson*, 561

U.S. 320, 323 (2010). As the Court recognized, the phrase "second or successive" is a term of art and does not refer to all Section 2254 applications filed second in time. *Id.* at 331-32; *see also Panetti v. Quarterman*, 551 U.S. 930, 944-45 (2007). The Court also took note that, within Section 2244(b), the phrase "second or successive" modifies applications, not claims. *Magwood*, 561 U.S. at 334. In Magwood's case, his 1986 resentencing resulted in a new judgment. *Id.* at 331. The habeas application at issue in the 2010 opinion was his first challenging the new judgment. Accordingly, the application was not "second or successive," and Section 2244(b) would not operate to dismiss any of its claims.

The Supreme Court has also observed that a "judgment of conviction includes both the adjudication of guilt and the sentence." *Deal v. United States*, 508 U.S. 129, 132 (1993). It therefore "follows that, where a first habeas petition results in an amended judgment, a subsequent petition is not successive regardless of whether it challenges the conviction, the sentence, or both." *Johnson v. United States*, 623 F.3d 41, 46 (2d Cir. 2010); *see also In re Brown*, 594 F. App'x 726, 729

(3d Cir. 2014); *Wentzell v. Neven*, 674 F.3d 1124, 1126-27 (9th Cir. 2012).[4]

Buntion's 2012 resentencing resulted in a new judgment: He was sentenced to death a second time. It matters not that his original judgment was vacated by subsequent state habeas proceedings rather than his initial federal proceedings. Under *Magwood*, because there was an intervening judgment, this application is not second or successive – because it is the first to challenge the new judgment – and Section 2244(b) therefore does not operate to dismiss it or any of its claims.

### 2.    If unexhausted, Buntion's claim is nevertheless procedurally viable.

Buntion's present claim was presented in his original direct appeal (i.e., the direct appeal following the first trial), as well as his original state habeas application. The claim was then presented to this Court, which granted relief.  The U.S. Court of Appeals vacated this

---

[4] The United States Court of Appeals for the Fifth Circuit has addressed a similar issue. In *In re Lampton*, 667 F.3d 585 (5th Cir. 2012), the court declined to follow *Johnson*. *In re Lampton*, 667 F.3d 585, 589 (5th Cir. 2012). *Lampton*, however, did not involve a new amended judgment. Instead, in involved the vacation of a conviction and sentence for a lesser included offense, which under the court's practice, "leav[es] the conviction and sentence on the greater offense intact." *Id.* at 588; *see also Wentzell*, 674 F.3d at 1127. *Lampton* does not control Buntion's petition because his original sentence was not left intact. The CCA vacated the original sentence with its 2009 opinion. The new death sentence that resulted from his 2012 resentencing was a completely new, inetervening judgment.

Court's judgment granting relief on the basis of the Due Process claim, but intervening cases have revealed the Fifth Circuit's earlier judgment was mistaken, and this Court was correct in concluding Buntion is entitled to relief on the basis that his trial judge's actual or apparent bias violated his right to due process. Because, as discussed in the foregoing section, the judgment attacked in this habeas petition is a new judgment, and has not previously been challenged in this Court, the doctrine of res judicata does not bar relief.

Caperton and Williams do not create a new claim or new constitutional protection; rather, they clarify the approach that is constitutionally mandated in cases where a judge's partiality is called into question. In both Caperton and Williams, the Supreme Court clarified that its then-existing precedent mandated that: 1) the inquiry regarding whether a judge's failing to recuse resulted in a due process violation is an objective and not subjective one; and 2) due process violations based on presumptive bias can result from scenarios other than those in which the judge has a pecuniary interest in the case or had made the decision to bring charges against the defendant as a one-man grand jury.

To the extent either the State argues or this Court believes that *Caperton* and *Williams* create a new claim, then that claim is unexhasted, but Buntion's failure to exhaust is clearly excused and stands as no barrier to his obtaining relief. For although *Caperton* noted the inquiry into a possible due process violation should be made using objective standards, Buntion's current claim could not have been raised before the Supreme Court made clear in *Williams* that a due process violation could result from a bias similar to Judge Harmon's in this case (as opposed to where there was only a pecuniary or quasi-pecuniary interest involved). *Williams* was issued on June 9, 2016, almost two years after Buntion filed his most recent state habeas application. To the extent this Court believes *Caperton* and *Williams* create a new claim (rather than merely elucidating that the CCA's original judgment rejecting this claim is objectively unreasonable), Counsel respectfully requests the Court enter an order staying and abating these proceedings so that Counsel may present Buntion's claim to the state habeas court, where section 5 of Article 11.071 should not operate to dismiss it because it relies on a previously unavailable legal basis.

3.   **The opinion issued by the Court of Appeals for the Fifth Circuit in Buntion's initial habeas proceedings is irrelevant to the claim in this proceeding.**

In addition to the fact that Buntion is attacking in these proceedings a new judgment, such that the doctrine of res judicata is inapplicable, there is a second reason the Fifth Circuit's resolution of the Due Process claim in prior proceedings is irrelevant to that claim in this proceeding.

In its opinion granting Buntion relief, this Court noted that the CCA had found that Buntion would have had to have demonstrated Judge Harmon was actually biased by marshalling proof at the hearing on his motion to recuse to be entitled to relief on his due process claim. No. 4:04-cv-01328, ECF No. 42 at 35. This Court found that the CCA's judgment was an unreasonable application of federal law because the Due Process Clause also "protects against the manifest unfairness caused by extreme cases of apparent bias." *Id.* at 37-38. This Court also held the state court's analyzing Buntion's bias related claims in

isolation rather than cumulatively involved an unreasonable application of federal law. *Id.* at 36-37.[5]

On appeal, the Fifth Circuit vacated this Court's order granting Buntion relief and entered one denying him relief. *Buntion v. Quarterman*, 524 F.3d 664, 676 (5th Cir. 2008). The Court's opinion does not contain a decision on the merits of Buntion's claim and in fact suggests that court would have ruled in Buntion's favor on the merits had it not been constrained by AEDPA. *See id.* ("Although we might decide this case differently if considering it on direct appeal, given our limited scope of review under AEDPA, we are limited to determining whether the state court's decision was objectively unreasonable"). *Caperton* and *Williams* reveal the Fifth Circuit erred in its review of this Court's determination that the state court judgment was objectively unreasonable. However, because Buntion is now attacking a new judgment, that error does not constrain this Court.

---

[5] Buntion also raised his bias-related claims in state habeas proceedings. Buntion was denied relief on his claims in those proceedings for the same reason he was denied relief on direct appeal: he had failed to marshal demonstrable proof that Judge Harmon was actually biased. *See Buntion*, 524 F.3d at 669. This Court's analysis with respect to whether the state court's decision involved an unreasonable application of federal law is therefore applicable to both of these reasoned state court decisions.

There is yet another reason the Fifth Circuit's previous opinion addressing this issue does not dictate the result in this proceeding. Having found what it perceived to be errors in this Court's opinion, the Court of Appeals proceeded to review de novo whether the CCA's decision involved an unreasonable application of federal law. However, and peculiarly, that section of the Court of Appeals' decision does not even refer to the CCA's opinion. It does not address whether the state court's holding that Buntion was not entitled to relief on his due process claim because he failed to marshal demonstrable proof that Judge Harmon was actually biased was a reasonable application of federal law. Instead, the Court found the CCA decision did not involve an unreasonable application of federal law because the type of bias exhibited by Judge Harmon was not similar to the bias at issue in any of the cases where the Supreme Court had found a due process violation based on presumptive bias. *Id.* at 672. This reasoning relied upon by the Fifth Circuit in rejecting Buntion's claim is not contained in the state court's decision denying that same claim.

The Fifth Circuit went to great lengths to uphold a state court judgment on the basis of an argument not relied upon by the state

court. And that action of the Fifth Circuit was not surprising, because at the time of prior proceedings in this case, the law in this Circuit was that "under AEDPA's deferential standard of review," a federal court should "review 'only the ultimate legal determination by the state court—not every link in its reasoning.'" *Charles v. Stephens*, 736 F.3d 380, 387-88 (5th Cir. 2013) (*quoting Trottie v. Stephens*, 720 F.3d 231, 241 (5th Cir. 2013)). Or, as the Fifth Circuit put it in a different case, a federal court should "only review the state court's actual decision, not the written opinion upon which it is based." *Green v. Thaler*, 699 F.3d 404, 414 (5th Cir. 2012). However, as the the Supreme Court recently confirmed, the approach previously employed by the Fifth Circuit is incorrect. "[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits, . . . a federal habeas court simply reviews the reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). This Court's previous holding that the CCA's judgment was unsound scrutinized the reasons actually given by the CCA, whereas the Fifth Circuit's opinion in Buntion's earlier habeas proceedings contains no determination whether the reasons given by the state court

are reasonable. It is now clear, in the wake of *Wilson*, that the question – as this Court correctly understood previously – is whether the CCA's reasoning in denying Buntion's due process claim was objectively unreasonable; and it is equally clear, in the wake of *Caperton* and *Williams*, that the CCA's decision was. Buntion is therefore entitled to relief.

## II. Buntion was denied his Sixth and Fourteenth Amendment right to a fair trial because extensive pretrial publicity rendered it impossible for an impartial jury to be seated in Harris County.

### A. The legal standard

The right to a jury trial guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors, and the failure to accord an accused a fair hearing violates even the minimum standards of due process. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (*citing In re Oliver*, 333 U.S. 257 (1948); *Tumey v. Ohio*, 273 U.S. 510 (1927)). A juror's verdict must be based upon the evidence developed at the trial, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life that he occupies. *Id.*

A defendant is denied due process and the right to a fair trial whenever prejudice or passion is allowed to undermine the impartial

administration of justice. *See Chambers v. Florida*, 309 U.S. 227, 236-37

(1940); *see also Sheppard v. Maxwell*, 384 U.S. 333 (1966) (extensive

inflammatory publicity denied due process and a fair trial); *Moore v.*

*Dempsey*, 261 U.S. 86 (1923) (mob dominated atmosphere is a denial of

due process). In fact, the essence of due process of law is that

> no man's life, liberty or property [may] be forfeited as
> criminal punishment for violation of that law until there had
> been a charge fairly made and fairly tried in a public
> tribunal free of prejudice, passion, excitement and tyrannical
> power. Thus, as assurance against ancient evils, our country,
> in order to preserve 'the blessings of liberty', wrote into its
> basic law the requirement, among others, that the forfeiture
> of the lives, liberties or property of people accused of crime
> can only follow if procedural safeguards of due process have
> been obeyed.

*Chambers*, 309 U.S. at 236-37.

One of the primary procedural safeguards against the influence of

"prejudice, passion, [and] excitement" is the change of venue. *See Irvin*,

366 U.S. at 722. Under certain circumstances only a change of venue is

sufficient to ensure the kind of fair trial mandated by the Sixth and

Fourteenth Amendments to the United States Constitution. *See, e.g.*,

*Rideau v. Louisiana*, 373 U.S. 723 (1963) (video of confession aired

three times on television mandated change of venue); *see also Pamplin*

*v. Mason*, 364 F.2d 1, 5 (5th Cir. 1966) (where outside influences

affecting the community's climate of opinion are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial).

Article 31.01 of the Texas Code of Criminal Procedure authorizes the trial court to order a change of venue if it is satisfied that the criminal defendant cannot be afforded a fair and impartial trial. Tex. Code Crim. Proc. art. 31.01. A trial court should, on its own motion, order a change of venue to remove "even the probability of unfairness" resulting from pretrial publicity. *See Martin v. Beto*, 397 F.2d 741, 749 (1968) (*citing Sheppard,* 384 U.S. at 353).

Prejudice may be presumed from all the circumstances. For example, a defendant can demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury. *Murphy v. Florida*, 421 U.S. 794, 798-99 (1975); *Sheppard*, 384 U.S. at 333 (1966); *Estes v. Texas*, 381 U.S. 532, 542-43 (1965); *Mayola v. Alabama*, 623 F.2d 992, 996-997 (5th Cir. 1980). Proof of such poisonous publicity raises a presumption that the defendant's jury was

51

prejudiced, relieving him of the obligation to establish actual prejudice. *Mayola*, 623 F.2d at 997; *see also Estes*, 381 U.S. at 444 (prejudice was presumed where "videotapes of hearings clearly illustrate that the picture presented was not one of that judicial serenity and calm to which petitioner was entitled).

### B.   The relevant facts

Approximately three months after pretrial proceedings commenced in Buntion's retrial, the Houston Chronicle, on Feb. 8th 2011, published on its front page an article titled "Death Row Cases Back for Retrial." 1 C.R. 256. The headline referred to the fact that as many as sixteen men sentenced to death in the Harris County courts could have their sentences overturned because they were tried during the period of time in which the nullification instruction found to be unconstitutional in *Penry v. Johnson* (*Penry* II) was used. While ostensibly about several defendants, the article's clear focus was Buntion and his then-imminent retrial. In the article, then-District Attorney Patricia Lykos, a former HPD officer, was quoted as saying that "[s]hould any of them receive a life sentence, it is possible that the 'early release' parole provisions of the '80s and '90s would result in

mandatory parole." *Id.* In addition to this article being published in the Houston Chronicle's edition, it was featured on the paper's website.

Two days later, the Chronicle published another story about Buntion titled "Killer's defense wants retrial moved." 1 C.R. 262. It explained that Buntion's trial attorneys planned to move for a change of venue due, in large part, to Lykos' comments recorded in the February 8th article. The article quoted Buntion's lead trial counsel as saying that "[m]andatory parole does not exist," and that Lykos' "attempt to pollute the jury panel just a couple of weeks before trial is just egregious." *Id*. The article went on to repeat Lykos' false statement about mandatory parole. *Id.*

The trial court convened a hearing on Buntion's motion to change venue on March 2, 2011. 7 R.R. 8. Terrance Windham, an assistant district attorney who had been employed at the Harris County D.A.'s office since 1989 testified for the State at the hearing. On cross-examination, he admitted that Lykos' statement was false and that there is no such thing as mandatory parole for life sentence. 7 R.R. 57. Windham testified he believed Lykos simply misspoke. Id.

Brett Ligon, the elected District Attorney of Montgomery County also testified for the State. 7 R.R. 61. Like Windham, Ligon confirmed that mandatory parole for life sentences does not exist. 7 R.R. 73. He believed that Lykos' comments to the Chronicle could mislead jurors. *Id.* Judge Mendoza denied Buntion's motion to change venue.

### C.    Buntion is entitled to relief on his claim.

Lykos' statement that Buntion could be eligible for mandatory release on parole if sentenced to life was unambiguously false. *Ex parte Franks*, 71 S.W.3d 327, 327 (Tex. Crim. App. 2001) ("We hold that a life-sentenced inmate is not eligible for release to mandatory supervision."). Made less than three weeks before jury selection was set to commence, regardless of whether she realized the statement was false, her statement was  designed to scare possible jurors and the public at-large into thinking that if Buntion was not sentenced to death, he would likely be immediately released from custody. And regardless of whether that was Lykos's intent, her statements reasonably and predictably had precisely that effect.

Whether a news story is accurate is an important consideration when determining whether it is inflammatory. *See Buntion v. State*, 482

S.W.3d 58, 71 (Tex. Crim. App. 2016) ("News stories that are accurate and objective in their coverage are generally considered by this Court not to be prejudicial or inflammatory."). While conceding Lykos' statement was incorrect, the CCA, in direct appeal proceedings, nonetheless found the stories in which her statement was published to be accurate. *Id.* at 74-75. This finding by the CCA demonstrates its decision to deny Buntion relief on his claim was based on an unreasonable determination of the facts. This Court should find that the press coverage was inflammatory and rendered it impossible for an impartial jury to be seated in Harris County.

### III.   Buntion received ineffective assistance from trial counsel in violation of his rights under the Sixth Amendment.

#### A. The legal standard

In determining whether trial counsel provided Buntion ineffective assistance of counsel, this Court must apply the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the defendant must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

Second, the defendant must satisfy the prejudice requirement by showing there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The prejudice inquiry "finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution…." *Strickland*, 466 U.S. at 694. Consequently, to prove prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

This test is not outcome determinative. The *Strickland* Court itself expressly rejected an "outcome-determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Id.* 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694. Thus, the "reasonable probability" standard – a probability

sufficient to undermine confidence in the outcome – is a less onerous

burden than even the preponderance of the evidence standard. The

Supreme Court reiterated this point in *Williams v. Taylor*, 529 U.S. 362

(2000), expressly noting that a state court's use of a preponderance of

the evidence standard rather than the lesser reasonable probability

standard would result in a decision that was contrary to federal law as

determined by that Court. *Williams v. Taylor*, 529 U.S. 362, 405-06

(2000) ("If a state court were to reject a prisoner's claim of ineffective

assistance of counsel on the grounds that the prisoner had not

established by a preponderance of the evidence that the result of his

criminal proceeding would have been different, that decision would be

'diametrically different,' 'opposite in character or nature,' and 'mutually

opposed' to our clearly established precedent because we held in

*Strickland* that the prisoner need only demonstrate a 'reasonable

probability that … the result of the proceeding would have been

different.'").

      With respect to how a court should analytically conduct the

prejudice inquiry in an individual case, several points require

mentioning. First, in making the determination whether counsel's

errors resulted in the required prejudice, a court must presume that the jury acted according to law. *Strickland*, 466 U.S. at 694. In other words, "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695. Therefore, the law itself, i.e. "the standards that govern the [sentencing] decision," must be considered when determining whether a probability sufficient to undermine the confidence in the outcome exists.

The prejudice inquiry is therefore case specific, in that it is an attempt to assess the effect that trial counsel's deficient performance had on the reliability of the outcome of a particular proceeding. A court reviewing a judgment imposing death from Texas would ask what effect counsel's deficient performance had on the way the jury answered the special issues. Jurors today deciding the punishment to impose for a murder that happened before September 1, 1991 are presented three or four special issues, which are codified in article 37.0711 of the Code of Criminal Procedure. The first question these jurors must answer is "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable

expectation that the death of the deceased or another would result." Tex. Code Crim. Proc. art. 37.0711, § 3(b)(1). The second special issue jurors in these cases must answer is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* art. 37.0711, § 3(b)(2). Only in cases where there is evidence to suggest the victim provoked the defendant, jurors must answer "whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." *Id.* art. 37.0711, § 3(b)(3).[6] The final question these jurors must answer, and that they answer only if they have answered "yes" to each of the first two (or three) special issues is "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." *Id.* art. 37.0711, § 3(e). If the jury answers the first two (or three) special issues "yes" and the final special issue "no,"

---

[6] Buntion's jurors had to answer this special issue. 5 C.R. 1907.

the trial court must impose a sentence of death. *Id.* art. 37.0711, § 3(g).
For any other combination of answers – including the inability of the
jury to unanimously agree on an answer for any question – the trial
court must assess a sentence of life in prison. *Id.*

Second, in making the prejudice determination, a court must
consider the totality of the evidence before the jury and then assess the
effect the errors might have had on any of the fact-findings made by the
sentence. As the *Strickland* Court observed:

> Some of the factual findings will have been unaffected by the
> errors, and factual findings that were affected will have been
> affected in different ways. Some errors will have had a
> pervasive effect on the inferences to be drawn from the
> evidence, altering the entire evidentiary picture, and some
> will have had an isolated, trivial effect. Moreover, a verdict
> or conclusion only weakly supported by the record is more
> likely to have been affected by errors than one with
> overwhelming record support. Taking the unaffected
> findings as a given, and taking due account of the effect of
> the errors on the remaining findings, a court making the
> prejudice inquiry must ask if the defendant has met his
> burden of showing that the decision reached would
> reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-96. Thus, a court reviewing how counsel's
errors affected the punishment phase of a Texas capital sentencing
proceeding must examine the relevant special issue (i.e. the "factual

findings") to determine whether and to what extent it may have been affected in light of the evidence before the jury.

## B. Trial counsel was ineffective for allowing Juror Kotsatos to serve on Buntion's jury.

### 1. Kotsatos indicated she was biased during voir dire.

On January 23, 2012, Juror Kotsatos was interviewed as a potential juror for Buntion's trial. 15 R.R. 46. On her juror questionnaire, Kotsatos had indicated she had conflicting emotions regarding the death penalty. She reported that she believed in the eye-for-an-eye principle, and that she did not believe life-without-parole was sufficient as a punishment.

Kotsatos also reported on her questionnaire that her ex-boyfriend had been murdered. During questioning, she explained that he had been out with a group of police officers (although he was not an officer) and was killed when a man opened fire on their group. 15 R.R. 53. Kotsatos stated that she attended his murder trial and was very emotionally impacted by it. She failed her college classes and suffered clinical depression. 15 R.R. 54.

When asked how her experience with this murder would impact her during this trial, Kotsatos stated "Well, that's been my hugest concern with all of this. . . . I still see those images of him on the autopsy table and blood pools and all that stuff." 15 R.R. 54-55.  She also admitted that she "would probably be distracted" and would not "be able to think as clearly as [she] would like to" because of memories of her ex-boyfriend's murder. 15 R.R. 56.

Specifically, the State asked Kotsatos whether she felt her experiences would make her unable to be a fair juror. Kotsatos stated that she thought "it would be highly probable that, yes, I would be distracted enough that I would maybe not be fair in my ultimate decisions." 15 R.R. 57. After discussing the jury charge, the State returned to this concern and asked Kotsatos again if she could fairly answer the charge because of her experiences. Kotsatos again stated "I would probably lean towards 'no.' I think my fairness would be—I don't know if I could do that or not." 15 R.R. 70. When asked further if she was worried that her experience would cause her to have a bias against either side, Kotsatos replied "yes" and that "It would most likely be a prejudice against the defendant." 15 R.R. 71.

Defense counsel asked Kotsatos only a couple of brief questions about her bias. Kotsatos confirmed that she felt her ex-boyfriend's murder would cause her to favor the State's position. 15 R.R. 72. Defense counsel dismissed this concern, telling Kotsatos "I'm not convinced that you have a bias just yet in talking to you." 15 R.R. 73.

The rest of defense counsel's questioning of Kotsatos focused on her ability to follow the law and consider mitigation information. After her questioning concluded, both the State and defense accepted Kotsatos as a juror in Buntion's case. 15 R.R. 107.

About two weeks after Kotsatos had been accepted as a juror but before the entire jury was picked and before the jury was sworn, one of Kotsatos' relatives called the court and informed the judge that the stress and fear of having to serve on Buntion's jury had caused her to take a significant downturn. 27 R.R. 115. While the relative was on the phone the trial court revealed Kotsatos had herself called the court after she was selected to inform the court of the stress being selected to serve on Buntion's jury was causing her to endure. *Id.* at 116. Defense counsel did not ask the Court to remove Kotsatos form the jury.

The following day, Kotsatos appeared in court and the court questioned her about whether she'd be able to serve as a juror. Kotsatos answered that she believed her condition "hinder [her] ability to perform [her] duties as a juror." 28 R.R. 25. Defense counsel again made no request to the judge for her to be removed.

### 2. Buntion was prejudiced by trial counsel's failure to request that Kotsatos be struck from the jury panel.

Pursuant to Article 35.16 of the Texas Code of Criminal Procedure, a juror is subject to a challenge for cause if that juror "has a bias or prejudice in favor of or against the defendant." Tex. Code Crim. Proc. art. 35.16(a)(9). A juror in a capital case is particularly subject to challenge if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotations omitted).

On multiple occasions, Juror Kotsatos expressed precisely the type of bias against Buntion that should have led to her being struck for cause from the jury panel. Yet, trial counsel failed to raise a challenge for cause against Kotsatos. Capital trial counsel are required under

standards of professional conduct to question potential jurors for bias

and to challenge their selection.  Am. Bar Ass'n, *Guidelines for the*

*Appointment and Performance of Defense Counsel in Death Penalty*

*Cases*, Guideline 10.10.2 (rev. ed. 2003), reprinted in 31 Hofstra L. Rev.

913 (2003) [hereinafter ABA Guidelines]; *see also Strickland*, 466 U.S.

at 688 (referring to the guidelines as guides to determining what

performance is reasonable). Juror Kotsatos openly and clearly

expressed a bias against Buntion. Had trial counsel raised a challenge

for cause, there is little question that the Court would have been

required to grant the challenge. *Little v. State*, 758 S.W.2d 551, 556

(Tex. Crim. App. 1988) ("When a prospective juror is known to be biased

or prejudiced as a matter of law, he must be excused when challenged,

even if he states he can set aside the bias or prejudice and provide a fair

trial."); *Williams v. State*, 565 S.W.2d 63, 65 (Tex. Crim. App. 1978)

("While a trial court may hold a juror qualified who states that he can

lay aside any opinion which he may have formed, no such discretion

vests in the court with reference to a juror with bias or prejudice toward

an accused."). There is no strategic reasoning that would justify keeping

a juror who is biased against your client on the jury panel, regardless of

her other voir dire answers. As such, trial counsel's failure to move to strike Juror Kotsatos constitutes deficient performance.

Counsel's deficient performance prejudiced Buntion's trial. Kotsatos stated during her questioning that she believed her experience of having her ex-boyfriend murdered would give her a bias against Buntion. Further, the facts surrounding her ex-boyfriend's murder – a group of police officers being shot at in a sudden, unexpected event – were sufficiently similar to the facts underlying Buntion's case to make Kotsatos particularly vulnerable to her bias. Having such a biased juror on his panel prejudiced Buntion. *See Von January v. State*, 576 S.W.2d 43, 45 (Tex. Crim. App. 1978) (when a partial, biased, or prejudiced juror is selected, good ground exists for a new trial).

In state habeas proceedings, where this claim was exhausted, the trial court concluded that, despite her testimony she would likely be biased against Buntion, Kotsatos was "a defense-oriented perspective juror." Findings of Fact, Conclusions of Law & Order at 32, No. 588227-C (178th Dist. Ct, Harris County, Tex. Dec. 28, 2016) [hereinafter FFCLs]. The CCA did not adopt the trial court's findings of fact and conclusions of law. With respect to this claim and all the other claims

Buntion raised in state habeas proceedings that alleged trial counsel provided him ineffective assistance, the CCA simply held that "Buntion had failed to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." *Ex parte Buntion*, No. WR-22,548-04 (Tex. Crim. App. June 7, 2017). The CCA's opinion offers no reasoning for its decision. Because Kotsatos indicated she would likely be biased against Buntion, this Court should find the CCA's decision is based on an unreasonable determination of the facts and that Buntion is entitled to relief.

### C. Trial counsel was ineffective for not conducting a neuropsychologicial evaluation on Buntion.

#### 1. The relevant facts

John Keirnan and Philip Scardino represented Buntion during his original 1991 trial. At the punishment phase of Buntion's 1991 trial, counsel presented testimony from Dr. Sally Webster, a forensic psychologist. 63 1991 R.R. 401. Dr. Webster administered the Bender-Gestalt Test to Buntion, which revealed Buntion had "minimal brain dysfunction," and that Buntion was "a little disorganized with things."

*Id.* at 419. The Bender-Gestalt Test was the only neuropsychological testing administered to Buntion prior to his 1991 trial.

Keirnan and Scardino also represented Buntion during his 2012 punishment phase retrial. Though counsel presented expert witness testimony from S.O. Woods and Dr. Mark Vigen, this testimony was solely focused on the TDCJ prison system. Defense counsel did not present any testimony, through an expert witness or otherwise, regarding Buntion's behavioral, psychological, or cognitive functioning.

### 2. Post-conviction investigation reveals that Buntion suffers from memory deficits associated with Mild Cognitive Impairment.

Based on Buntion's age, health, and the 1991 testimony of Dr. Webster, state post-conviction counsel retained neuropsychologist Dr. James Underhill to conduct a comprehensive neuropsychological evaluation of Buntion. The purpose of the neuropsychological testing was to determine whether "measureable neuropsychological dysfunction or deficits were present, and if so, what the nature, extent, and effects of the impairments were on Buntion's behavioral, psychological, and cognitive functioning." Exhibit 3 (Affidavit of Dr. James Underhill) at para. 10.

Dr. Underhill administered a comprehensive neuropsychological evaluation to Buntion on two occasions in September 2014. Dr. Underhill's formal assessment included portions of the Halstead-Reitan neuropsychological battery, the Meyers Neuropsychological Battery, and other standardized neuropsychological measures designed to assess a patient's frontal, parietal, temporal, and occipital lobe functions. Each neuropsychological test administered by Dr. Underhill had appropriate and documented standardization, reliability, and validity. The tests used by Dr. Underhill are often administered and are generally accepted in the neuropsychology community. Each of the tests administered by Dr. Underhill were widely available and in use at the time of Buntion's punishment retrial in 2012. Exhibit 3 at para. 11.

Among other tests, Dr. Underhill administered portions of the Meyers Neuropsychological Battery ("MNB"), which is a comprehensive standardized neuropsychological testing battery. The MNB has been used since the early 1990s to evaluate sensory, motor, attention, memory, language psycho-motor and executive functioning and provides a picture of the individual's overall brain functioning. The MNB has demonstrated accuracy in determining the presence or absence of brain

damage, with a 96.1% accuracy rate of identifying brain damaged individuals. Exhibit 3 at para. 19.

Dr. Underhill's testing revealed that Buntion suffers from "mild memory problems that are associated with a condition known as Mild Cognitive Impairment ("MCI")." Exhibit 3 at para. 20. This loss of memory functioning is not due to Buntion's advanced age, as Buntion's scores on the relevant tests place him in the bottom 4.4 percent of similarly aged individuals. *Id.*

MCI is a neurological condition in which an individual has difficulties with memory or other cognitive functioning. For a diagnosis of MCI, these deficits must be greater than normal for the individual's age and demographic, but not so severe as to interfere with daily life or to warrant a diagnosis of dementia. Exhibit 3 at para. 21.

Dementia is not a specific disease, but rather a general term used to refer to a decline in mental ability marked by symptoms that affect decision-making, memory, cognitive functioning and social functioning that are severe enough to interfere with daily life. Exhibit 3 at para. 24. Alzheimer's disease is a specific cause of dementia that progressively erodes memory and thinking skills, ultimately eliminating the ability to

carry out simple tasks. *Id.* Dementia of the Alzheimer's type is a disorder listed in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR")[7] that is defined by a constellation of symptoms that mirror those required for a diagnosis of Alzheimer's disease. *Id.* at para. 25. A definitive diagnosis of Alzheimer's disease requires a biopsy or autopsy, according to the National Institute of Health ("NIH"). *Id.*

MCI is widely regarded as an initial stage along the disease process between normal neurological functioning and dementia or dementia of the Alzheimer's type. Studies suggest that eighty percent of individuals diagnosed with MCI will develop dementia or dementia of the Alzheimer's type within five to seven years of their MCI diagnosis. Exhibit 3 at paras. 21-22. Individuals such as Buntion, who are over the age of sixty-five, progress from MCI to dementia at a higher rate than other age groups. *Id.* at para. 23.

While the exact disease progression from MCI to dementia of the Alzheimer's type is different for each individual, certain deficits are

_____

[7] The DSM-IV-TR was the most current edition of the DSM in use at the time of Buntion's punishment retrial in 2012. The fifth edition (DSM-V) was released in 2014. Exhibit 3 at n.1.

commonly observed. Individuals with dementia of the Alzheimer's type suffer from impaired memory, diminished ability to generate appropriate words during conversation, and often repeat themselves. Executive functioning, the ability to integrate and assess information in a manner necessary to think, reason and problem solve, becomes compromised. Dementia and dementia of the Alzheimer's type are both marked by a decline in an individual's fine motor skills.  The ability to perform complex movements, such as writing or drawing, is impaired, as is the ability to use simple tools. As a result, self-care becomes extremely difficult, as the ability to use eating utensils and grooming implements is severely compromised. Ultimately, an individual with dementia or dementia of the Alzheimer's type can struggle to perform basic movements, such as chewing or swallowing food. Exhibit 3 at paras. 24-25.

There is currently no cure for dementia of the Alzheimer's type, though the Federal Drug Administration has approved medications to slow the progression of cognitive decline. Current NIH research suggests that these medications may slow the progression from MCI to dementia for a period of one year. Exhibit 3 at para. 28.

### 3. Trial counsel's failure to discover Buntion's memory problems and Mild Cognitive Impairment constituted deficient performance.

Trial counsel's failure to discover and present evidence of Buntion's MCI "fell below an objective standard of reasonableness" expected of capital defense attorneys. *Strickland*, 466 U.S. at 688. Counsel overlooked several indications that Buntion's neurological condition was in need of evaluation, and their failure to consult with an expert in that field was "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011).

### 4. Trial counsel overlooked specific evidence that neuropsychological testing should have been administered to Buntion.

Buntion was originally tried for capital murder and sentenced to death in 1991 at the age of forty-seven. Keirnan and Scardino represented Buntion during his first trial, presenting evidence from Dr. Sally Webster, a psychologist, that Buntion demonstrated "minimal brain dysfunction" on the Bender-Gestalt Test. 63 1991 R.R. 401. More than twenty years later, Keirnan and Scardino represented Buntion

during his retrial, but did not consult with a neuropsychological expert in preparation for trial.

Several factors should have prompted trial counsel to consult with a neuropsychologist prior to Buntion's 2012 retrial. First, counsel was aware of Dr. Webster's aforementioned testing that indicated Buntion had "minimal brain dysfunction." Had counsel consulted with a neuropsychologist such as Dr. Underhill, that expert would have recommended Buntion undergo further neuropsychological testing. Exhibit 3 at para. 18. Second, more than twenty years had elapsed between Buntion's original trial in 1991 and his punishment retrial in 2012. Buntion spent those two decades incarcerated on death row, first at the Ellis Unit in Huntsville, then moving in 2000 to the more isolative Polunsky Unit in Livingston. Given the fact that incarceration, especially the extreme isolation Buntion experienced at the Polunsky Unit, ages individuals more rapidly than life outside of prison, *see* Exhibit 2 (Affidavit of Dr. William Kelly) at para. 8, trial counsel should have investigated whether those two decades impacted Buntion's neurological condition. Finally, Buntion was sixty-eight years old at the time of his retrial in 2012. Elderly individuals are known to have an

elevated risk of developing dementia. Exhibit 3 at para. 23. As such, counsel should have recognized Buntion's advanced age as a reason for conducting an inquiry into his neurological or neuropsychological condition at the time of his retrial in 2012, especially in light of the results of the 1991 testing.

### 5. Professional standards required investigation of Buntion's neuropsychological condition.

At every stage of a death penalty case, counsel "have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." ABA Guidelines, Guideline 10.11(A).

Because the duty to investigate all avenues of mitigation is instrumental to the defense of a capital case, the ABA Guidelines require that the defense team consist of two qualified attorneys, an investigator, and a mitigation specialist. *Id.* at Guideline 4.1(A)(1). Counsel's own observations of the client's mental status, while necessary, *see id.* at Guidelines 10.5, 10.15.1(E)(2), are not necessarily sufficient to detect the array of conditions that could be of critical importance.

Further investigation into a client's neurological condition may consist of hiring experts to "rebut or explain evidence presented by the prosecutor." *Id.* at Guideline 10.11(F)(2); *see also* ABA Standards For Criminal Justice: Providing Defense Services, Standard 5-1.4 cmt. (3d ed. 1992) (National standards on defense services have consistently recognized that quality representation cannot be rendered unless assigned counsel has access to, among other things, expert witnesses.).

In particular, mental health and neurological experts are essential to defending capital cases. Neurological impairment is common among persons convicted of violent offenses on death row. *See, e.g.*, Craig Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation*, 35 Santa Clara L. Rev. 547, 559-83 (1995). As a result, counsel must obtain, when appropriate, a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary. *See* Douglas S. Liebert, Ph.D. & David V. Foster, M.D., *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 Am. J. Forensic Psychiatry 43, 43-64 (1994).

**6.     There is a reasonable probability the jury's verdict would have been different had trial counsel presented evidence of Buntion's Mild Cognitive Impairment.**

Evidence that Buntion suffers from MCI would have been substantial, persuasive evidence that could have altered the jury's answers to the question of whether there was a probability Buntion would commit future acts of violence and whether there were mitigating circumstances that warranted a sentence of life imprisonment. Individuals with MCI are at an elevated risk of developing dementia or dementia of the Alzheimer's type within a few years of diagnosis. Exhibit 3 at paras. 22-23. Dementia results in a significant deterioration of neurological functioning, coupled with a loss of fine motor skills. *Id.* at paras. 24, 26-27. Taken in consideration with Buntion's advanced age and diminished physical condition, *see* Exhibit 2 at para. 9, the increased likelihood that Buntion will succumb to the throes of dementia or dementia of the Alzheimer's type suggests that there is a minimal possibility that Buntion would even be physically capable of committing acts of violence.

The fact that Buntion has an elevated probability of developing dementia due to his diagnosis with MCI is also a significant mitigating

circumstance that could have swayed jurors towards a life sentence.
The progression from MCI towards dementia is marked by a steep
decline in cognitive and physical functioning. This pending decline
raises the daunting spectre that in several years Buntion may not be
oriented as to date and time, or be aware of the facts underlying his
incarceration on death row, thus calling into question his competency to
be executed. *See Panetti v. Quarterman*, 551 U.S. 930 (2007); *see infra*
Part VI.

In state habeas proceedings, where Buntion exhausted this claim,
the trial court found that trial counsel was not ineffective for not
employing a neuropsychologist "in light of the expert opinions sought
and obtained by trial counsel at both [Buntion's] 1991 trial and his 2012
new punishment hearing. FFCLs at 13. While the CCA did not adopt
the trial court's findings and conclusions, it offered no reasoning for its
decision that Buntion had failed to satisfy his burden under *Strickland*.
Because the only experts employed by counsel in preparation for the
2012 trial were ones tasked solely with analyzing Buntion's behavior at
TDCJ and because the testimony from the 1991 expert is precisely what
should have alerted trial counsel of the need to employ a

neuropsychologist, this Court should find the state habeas court's

decision is based on an unreasonable determination of the facts.

Because there is a reasonable probability that the jury's verdict would

have been different had jurors heard evidence of Buntion's Mild

Cognitive Impairment and its impact on his future physical and

neurological condition, Buntion should receive a new punishment trial.

> **D.   Trial counsel was ineffective for failing to present individualized evidence that there was not a probability that Buntion would commit future acts of violence.**

> ### 1.   The relevant facts

Buntion was born on March 30, 1944. At the time of his

punishment retrial in February 2012, Buntion was just shy of his sixty-

eighth birthday. Buntion had spent the previous twenty-one years of his

life incarcerated by TDCJ under a sentence of death. During those two

decades, Buntion adapted well to life on death row, both at the Ellis

Unit in Huntsville and later at the more restrictive Polunsky Unit in

Livingston. However, those years also aged Buntion, and by the time of

his retrial in 2012, his physical health was debilitated to the point

whereby it was unlikely he could commit an act of violence in prison.

### 2.    Age and physical condition

Research on the effects of incarceration on the physical condition of inmates clearly indicates that life in prison has the effect of accelerating the aging process so that inmates appear "11.5 years older than their chronological ages after age 50." B. Jaye Anno et al., *U.S. Dept. of Justice, Nat'l Inst. of Corr., Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004), *available at* http://static.nicic.gov/Library/018735. This "accelerated aging" is largely due to the unique rigors and daily stresses of prison life. Exhibit 2 (Affidavit of Dr. William Kelly) at para. 8.[8] Buntion was first incarcerated at a TDCJ facility in 1961, when he was seventeen years old. Over the next three decades, Buntion spent more time incarcerated than he did in free society. By the time of his punishment retrial in 2012, Buntion had spent nearly forty years in prison, including twenty years on death row. Thus, Buntion's effective physiological age at the time of his retrial was close to eighty years old. Exhibit 2 at para. 8.

---

[8] Dr. William Kelly is a professor of sociology at the University of Texas-Austin who specializes in criminology and recidivism. Exhibit 2 at paras. 2-3.

As people age, the likelihood they will engage in criminal behavior decreases. This relationship between age and criminal behavior is well-documented and persists across offenders with differing types of convictions. This phenomenon of "aging out of crime" after reaching a certain age is understood as the result of both physical aging and psychological aging. As a person ages, his physical ability to engage in aggressive activities is reduced substantially. Similarly, physical impairments often result in a person's feeling more vulnerable, which in turn decreases a person's desire to engage in aggressive behavior. Exhibit 2 at para. 10.

At the time of his punishment retrial, Buntion's overall health and physical condition was poor. Buntion suffered from poor vision, hypertension, and severe arthritis in his right hand. His energy level and mobility was (and remains) poor, limiting his ability to exercise or perform other physical tasks. *Id.* at para. 9. Due to Buntion's advanced age at the time of his punishment retrial, as well as his diminished physical health, he generally lacked the physical capacity to engage in aggressive or assaultive behavior. *Id.* at para. 12.

### 3.    Institutionalization

Aging also tends to result in a psychological shift which causes a resignation or acceptance of one's circumstance. Exhibit 2 at para. 11. As a person ages, and their physical abilities change, that person's expectations and desires adjust as well. *Id.* In a prison setting, this results in an inmate becoming more adjusted to institutional life, or becoming "institutionalized." *Id.*

Buntion has spent the majority of his adult life in prison, including two decades on death row. Despite having spent nearly forty years of his life in prison, Buntion received very few disciplinary reports during his various incarcerations. Exhibit 2 at paras. 14-20. In the twenty years he spent on death row, Buntion received three minor disciplinary reports. *Id.* at para. 20. Buntion adjusted well to life on death row, first at the Ellis Unit in Huntsville, then at the Polunsky Unit in Livingston. While at the Ellis Unit, Buntion's good behavior meant he was eligible for and participated in a number of prison programs, including working in the prison's garment factory. Though Buntion prefers to work while in prison, he has not had that opportunity since 2000, when death row moved to the Polunsky Unit in

Livingston. Buntion has not had any disciplinary reports during his years at the Polunsky Unit. Exhibit 2 at para. 22.

Over the decades that Buntion has been incarcerated, he has learned how to live in prison, and has become well-socialized into institutional life.  Buntion's disciplinary and behavioral record reflect this, as well as his expressed desire to avoid trouble and serve his time incarcerated quietly. Exhibit 2 at paras. 23-24.

> **4.    Trial counsel failed to present individualized evidence that Buntion was not likely to commit acts of violence.**

The second special issue Buntion's jury had to consider was whether there was a probability he would engage in "criminal acts of violence that would constitute a continuing threat to society." 5 C.R. 1306. According to the CCA, this special issue "focuses upon the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person." *Coble v. State*, 330 S.W.3d 253, 268 (Tex. Crim. App. 2010). Thus, it was imperative for trial counsel to present evidence specific to Buntion that would convince a jury to answer this special issue in the negative, which would result in a life sentence for Buntion.

At trial, the defense presented testimony from S.O. Woods, a former TDCJ warden. 39 R.R. 152-248. Woods described how TDCJ inmates are classified, provided a description of prison life, and discussed Buntion's prison records. Though Woods had interviewed Buntion many years earlier as part of Woods' employment at TDCJ, Woods did not interview Buntion in preparation for the 2012 trial. Dr. Mark Vigen, a psychologist, testified about studies he conducted that predicted what factors influence an inmate's proclivity for committing violence while incarcerated. 40 R.R. at 23-124. Dr. Vigen similarly did not interview Buntion and was precluded from offering an opinion on Buntion's psyche as a result. *Id.* at 33-35.

Trial counsel should have employed an expert such as Dr. William Kelly, a sociologist with a specialty in criminology, to interview Buntion and testify about how certain aspects of Buntion's personality and physical condition would affect whether Buntion would be a continuing threat. Had they done so, trial counsel could have presented the evidence discussed above regarding Buntion's poor physical health and how it would diminish the likelihood that Buntion would be capable of, or willing to, commit future acts of violence. Moreover, an expert such

as Dr. Kelly could have discussed the phenomenon of "institutionalization" whereby an inmate becomes accustomed to incarceration, accepts the reality of that situation, learns the rules of prison, and peacefully abides by them.

Trial counsel's failure to present an expert who had interviewed Buntion also left them unable to rebut aggravating evidence presented during the State's case. The State introduced eleven letters written by Buntion, State's trial Exs. 114-21, 127-29, eight of which were written during the two years prior to the 2012 retrial, and three of which were written in 1990. Though the State argued these letters demonstrated Buntion's desire to do harm to people he thought had wronged him, 44 R.R. 89-93, an expert familiar with Buntion's past and personality could have testified that the letters reflected Buntion's anxiety about his trial(s) and his frustration with how his prior legal proceedings had ended. Exhibit 2 at para. 25.

In state habeas proceedings, in which Buntion exhausted this claim, the trial court concluded that trial counsel were not ineffective for not employing an expert such as Dr. Kelly when trial counsel did employ Dr. Vigen. FFCLs at 29. This court should find the state court

deicison is based on an unreasonable determination of the facts. Trial counsel did not even bother to have Dr. Vigen interview Buntion. Because of this he was unable to offer an opinion regarding whether Buntion would constitute a future danger.

### E. Buntion received ineffective assistance of counsel when trial counsel failed to mitigate evidence regarding Buntion's alleged gang membership.

#### 1. Evidence presented of Buntion's alleged gang membership

As discussed above, in the presentation of the defense's case, trial counsel presented the testimony of S. O. Woods, a former head of the classification office at TDCJ. 39 R.R. 52. Woods' testimony was primarily focused on describing for the jury the type of classifications available to inmates within TDCJ and an evaluation of Buntion's previous behavior while in prison. 39 R.R. at 156-79. During his testimony, however, Woods also discussed Buntion's classification by TDCJ as being a member of a security threat group, or "gang." 39 R.R. 182-85.

Woods described security threat groups as being "organized groups of inmates who represented severe threats to the management of the prison system." 39 R.R. 182. Woods discussed how TDCJ had

identified several such groups that were "highly recognized by the administration as dangerous" and that "individual members of [those groups] were removed from the general population and locked down" in order to ensure safety of the prison population. 39 R.R. 183. Woods told the jury that Buntion had been identified as being a member of one of these groups, known as the Aryan Brotherhood. 39 R.R. 184.

Woods further testified that, because of Buntion's classification as belonging to the Aryan Brotherhood, should he receive a life sentence he would still be returned to "lockdown, maximum custody," also known as administrative segregation. 39 R.R. 184. Thus, even with a life sentence, Buntion would spend the remainder of his days in a prison setting much like what he had experienced for twenty years on death row. 39 RR 185. This would accomplish placing Buntion under the same substantial restrictions and restraints, and therefore would mean he would be a low risk of committing future acts of violence. 39 R.R. 184-87.

With the door to this line of inquiry open, the State on cross-examination asked Woods to discuss the nature and activities of the Aryan Brotherhood. Woods described how TDCJ considered the Aryan

Brotherhood "either criminally oriented, racially oriented, hate oriented, to the point that they were a threat to the staff, threat to the inmates." 39 R.R. 192. The group is essentially a criminal enterprise, like the mafia, that threatens inmates to obtain "sex, drugs, and property," commits crimes ranging from extortion to murder, and compromises prison staff. 39 R.R. 192, 234-36. The group is particularly dangerous, and thus needs to be segregated from the general population, because they are adept at hiding their illegal activities. 39 R.R. at 192-93. Woods testified that Buntion is a member of this group and would be able to get other members to do violent and illegal acts for him if so desired. 39 R.R. at 193-95, 234-36.

> 2. **Trial counsel failed to present evidence to mitigate the impact of testimony about Buntion's alleged prison gang membership, prejudicing his trial.**

Having opened the door to Buntion's prison gang membership, counsel should have expected that the State would seek to turn that evidence against Buntion, highlighting what is typically understood as the violent, illegal, and dangerous nature of gang activity. While the strategic merits of using this evidence to show that Buntion would be under administrative segregation when returned to prison might be

debated, it is without question that professional norms required counsel to at the very least anticipate the State's use of this information as aggravating and prepare a way to rebut that effort. *Rompilla v. Beard*, 545 U.S. 374, 385 (2005) ("With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation.").

From the remainder of the defense presentation, it appears that trial counsel did, in fact, believe that Buntion's classification as an Aryan Brotherhood member was unjustified. For example, when questioning a prison guard who knew Buntion, counsel elicited that the guard had never actually found any gang related contraband or materials in Buntion's cell. 39 R.R. at 254. On cross-examination, though, the guard agreed that Buntion could use someone else in the Aryan Brotherhood to retaliate against someone and that, just because he had not personally seen evidence that Buntion was a member, it did not mean Buntion was not one. 39 R.R. at 263-64, 267.

Trial counsel performed deficiently in failing to present affirmative evidence to mitigate the highly damaging evidence they themselves sponsored of Buntion's alleged membership in the Aryan Brotherhood. Had counsel interviewed inmates or former inmates who had previously been housed with Buntion, they could have developed credible evidence to show that Buntion was misclassified as a member of a gang, and that Buntion had not been a threat to any guard or other inmate in the twenty years he had spent on death row.

For example, counsel could have presented the testimony of Anthony Graves, who spent approximately twelve years as an inmate on death row with Buntion. Exhibit 1 (Affidavit of Anthony Graves) at para. 1.  Graves was exonerated in 2010 and released from prison. *Id.* Prior to being exonerated, Graves had spent substantial time at both the Ellis and Polunsky Units at the same time as Buntion, and knew of Buntion's character and reputation for being a calm, non-threatening, non-violent individual. *Id.* at paras. 2, 7.

Graves knew that Buntion was classified as being a member of the Aryan Brotherhood. However, Graves never witnessed anything from Buntion that made him believe Buntion was actually a true member of

the gang, or that Buntion held any racial animus. As a black man,

Graves never felt threatened by Buntion and never had any conflicts

with him. Buntion was friendly with guards and inmates alike,

regardless of their race, and Graves never saw Buntion do anything to

suggest he would be a danger to a guard, prison staff, or other inmate.

Indeed, to the contrary, based on his interactions with Buntion, Graves

would have told the jury that Buntion was an independent man who

was not the sort to be interested in being part of a gang. Exhibit 1 at

para. 13.

In state habeas proceedings, the trial court's findings fail to

acknowledge that trial counsel are responsible for the door being opened

to testimony about Buntion's alleged gang membership, FFCLs 13-14,

29-30, and should therefore be found to be based on an unreasonable

determination of the facts.

## F.    Buntion was prejudiced by the cumulative effect of trial counsel's deficiencies.

As the *Strickland* Court explained, when considering the prejudice

caused by trial counsel's deficient conduct, a court must consider the

totality of the evidence. *Strickland*, 466 U.S. at 695-96. If this Court

believes each of trial counsel's errors standing alone is insufficient to

find Buntion was prejudiced, the Court should consider the cumulative

effect of the errors and find that Buntion was prejudiced by trial

counsel's deficiencies.

IV.  **Buntion's death sentence is arbitrary, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, because the punishment is based on the jury's unreliable speculation about his future behavior, which has subsequently been proved false.**

A.  **Evidence now confirms that predictions of future dangerousness are inherently unreliable.**

The Supreme Court sanctioned the modern-era Texas death

penalty statute through its opinion issued in *Jurek v. Texas*, 428 U.S.

262 (1976). The *Jurek* Court found that predicting future

dangerousness, while "difficult," was still possible. *Jurek*, 428 U.S. at

274. As mentioned above, seven years later, the Court was still not

convinced that testimony about future dangerousness was sufficiently

unreliable to run afoul of the Eighth Amendment. *Barefoot*, 463 U.S. at

899. In upholding the future dangerousness inquiry and, with it, the

constitutionality of the Texas death penalty statute, the Court

depended upon "first generation" evidence on the reliability of

prediction of future dangerousness. *Cf.* John Monahan, *The Prediction*

*of Violent Behavior: Toward a Second Generation of Theory and Policy*,

141 Am. J. Psychiatry 10, 10 (1984). Now that hundreds of capital defendants have been labeled future dangers by juries over the course of several decades, new evidence has emerged, and that new evidence demonstrates unequivocally that these predictions are, in fact, entirely unreliable.

Specifically, an actuarial study of Texas inmates convicted of capital murder found that the expected rates of violence would be very low for a prisoner convicted of capital murder serving a life sentence with an average duration of forty years. The overall likelihood of inmate-on-inmate homicide would be only 0.2 percent, and the likelihood of an aggravated assault on a correctional officer would be only 1 percent. *See* Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. Crim. L. & Criminology 1251, 1261, 1264 (2000). These data suggest not only that bona fide cases of future dangerousness are infrequent, but also that it is virtually impossible to predict future dangerousness with any degree of scientific accuracy.

The fundamental problem with the future dangerousness inquiry as providing the sole basis for sentencing a capital murder defendant to

death is the number of false positives generated by that inquiry. Empirical research unequivocally reveals that predictions of future dangerousness wrongly identify non-dangerous defendants as dangerous. A recent study focused on 155 Texas inmates in whose capital murder trials experts had testified for the State on the issue of the defendant's propensity to commit future acts of violence. John F. Edens et al., *Predictions of Future Dangerousness in Capital Murder Trials: Is it Time to "Disinvent the Wheel?,"* 29 Law & Hum. Behav. 55, 61 (2005). Of these 155, 65 had been executed by the time of the study, 42 were on death row, and 48 had had their death sentences reduced. *Id.* Of the 155, none committed homicide in prison and only 5.2 percent committed a serious assaultive act. *Id.* at 62. The overwhelming majority had only minor disciplinary infractions, and over 20 percent had none at all. *Id.* at 62-63; *see also* Brittany Fowler, *A Shortcut to Death: How the Texas Death-Penalty Statute Engages the Jury's Cognitive Heuristics in Favor of Death*, 96 Tex. L. Rev. 379, 383 (2017).

Another study examined 92 former Texas death row prisoners whose sentences had been reduced and were therefore living in the general prison population. The behavior of these 92 former death row

inmates was compared to the behavior of other capital murder defendants who had been sentenced to life at their trials. The study demonstrated that the supposed future dangers "were not a threat to the institutional order" and indeed had a lower rate of assaultive institutional misconduct than defendants not deemed to be a future danger. In fact, the rate of violent misconduct in prison among former death row inmates was lower than the rate among the general prison population as a whole. *See* James W. Marquart, Sheldon Ekland-Olson & Jonathan Sorensen, *Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 Law & Soc'y Rev. 449, 464 (1989). Further, 12 of these 92 former death row inmates were eventually released, and of those dozen, only one committed an act of violence while in free society. *Id.* at 465.

To be sure, the studies mentioned above focus almost exclusively on behavior in prison. Although this Court has "construed the future dangerousness special issue to ask whether a defendant would constitute a threat 'whether in or out of prison,'"[9] *Coble v. State*, 330

---

[9] The Supreme Court's decision in *Buck* seems to suggest the Court believes the relevant inquiry should be whether an inmate will commit future acts of violence in prison. *See Buck*, 137 S. Ct. at 776 ("Buck's prior violent acts had occurred outside of prison, and within the context of romantic relationships with

S.W.3d 253, 268, studies tracking the future behavior of previously

death-sentenced inmates outside of prison are all but nonexistent. This

is, of course, because very few inmates who are sentenced to death ever

re-enter free society. The only studies of this type of which Counsel is

aware demonstrates that defendants who are sentenced to death and

later released to free society are not a danger to society. A study

released in 1989 tracked the 558 inmates who had their death

sentences commuted as a result of the Supreme Court's decision in

*Furman v. Georgia*, 408 U.S. 238 (1972). James W. Marquart &

Jonathan R. Sorensen, *A National Study of the Furman-Commuted*

*Inmates: Assessing the Threat to Society from Capital Offenders*, 23 Loy.

L.A.L. Rev. 5, 14 (1989). Of the 558, 239 had been paroled and entered

free society by the time the study concluded. *Id.* at 23. Of these 239,

only thirteen – 5.4 percent – committed future acts of violence. *Id.* at 24

(including those parolees who committed murder, rape, robbery, and

aggravated assault). Of these 239, 188 had been sentenced to death for

---

women. If the jury did not impose a death sentence, Buck would be sentenced to life
in prison, and no such romantic relationship would be likely to arise. A jury could
conclude that those changes would minimize the prospect of future
dangerousness."); *see also* Sheri Lynn Johnson, *Buck v. Davis From the Left*, 15
Ohio St. J. Crim. L. 247, 252-53 (2017).

murder. *Id.*[10] *Only one parolee of this group of 188 committed another murder before the end of the study*. *Id.* Only six of the 188 committed any violent offense. *Id.*; *see also* Sorensen & Pilgrim, *supra*, at 1254-55 (2000).

Joan Cheever's study reached a similar conclusion. Joan Cheever, Back from the Dead (Wiley 2006). Cheever located 322 men who were released from death row following the Supreme Court's decision in *Furman*. Just more than ten percent (36) went back to prison for an act of violence; three were convicted of murder. There can be no doubt that a legitimate aim of the criminal justice system is to prevent convicted felons from committing additional violent acts, but when the false positives surpass the true positives by a ratio of 99 to 1, the system is quintessentially unreliable, and that unreliability violates the Eighth Amendment.

Two critical studies analyzing capital juries' abilities to predict a defendant's future dangerousness have been recently released and confirm the findings of these earlier studies. The first of these considered a sample of 72 male federal capital defendants whose trials

---

[10] The other fifty-one parolees had been sentenced to death for rape.

involved a jury determination on the issue of future violence. Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223, 233-34 (2009). In these 72 cases, jurors found 38 defendants would not be a future danger and 34 would. *Id.* at 234. Yet the rates of future violence of the two groups were virtually identical. *Id.* at 236 (Table 3). Jurors' predictions of future violence in these cases were wrong 97% of the time. *Id.* at 240; *see also* Edmondson, *supra*, at 910-11.

The second of these more recent studies was released in 2013 and focused on 115 Oregon inmates who had been convicted of capital murder and sentenced either to life or death. Thomas J. Reidy, Jon R. Sorensen & Mark D. Cunningham, *Probability of Criminal Acts of Violence: A Test of Jury Predictive Accuracy*, 31 Behav. Sci. L. 286, 292 (2013). Oregon adopted the Texas capital sentencing scheme, and so Oregon jurors must decide whether there is a probability a defendant would commit future acts of violence before he can be sentenced to death. *Id.* at 291. Jurors had found 78 of these defendants would be a future danger and 37 would not. *Id.* at 296. Of the 78, only 50 were

sentenced to death. *Id.* at 298. The rates at which these two groups –

i.e., the 78 whose jurors found they would commit future acts of violence

and the 37 whose jurors found they would not – committed future

violent acts were identical, 5.9 incidents per year per 100 inmates. *Id.*

In other words, Oregon jurors, like Texas and federal jurors, cannot

predict which inmates would commit future acts of violence. *See also*

Edmondson, *supra*, at 908-10.

In *Barefoot*, the Supreme Court reached the decision to permit

experts to testify about a defendant's propensity to be dangerous in the

future because it was not persuaded that such predictions are "entirely

unreliable"; indeed, the justices seem to have believed that such

predictions are accurate approximately one-third of the time. *See*

*Barefoot*, 463 U.S. at 900-01 & n.7. However, studies of Texas death row

inmates' behavior conducted since *Barefoot* was decided entirely

undermine the factual predicate of *Barefoot* and reveal that predictions

of future dangerousness are wrong in more than 95 percent of cases. *See*

Jessica L. Roberts, Note, *Futures Past: Institutionalizing the Re-*

*Examination of Future Dangerousness in Texas Prior to Execution*, 11

Tex. J.C.L. & C.R. 101, 121 (2005).[11]

---

[11] For additional scholarship since *Barefoot* confirming the overwhelming consensus that predictions of future dangerousness are grossly inaccurate and produce frequent false positives, see Mark David Albertson, *Can Violence Be Predicted? Future Dangerousness: The Testimony of Experts in Capital Cases*, 3 Crim. Just., Winter 1989, at 18 (describing consensus among experts that predictions are mostly inaccurate); William W. Berry III, *Ending Death by Dangerousness: A Path to the De Facto Abolition of the Death Penalty*, 52 Ariz. L. Rev. 889, 907 (2010) ("The incontrovertible scientific evidence demonstrates that future dangerousness determinations are, at best, wildly speculative."); Stephen P. Garvey, *"As the Gentle Rain from Heaven": Mercy in Capital Sentencing*, 81 Cornell L. Rev. 989, 1031 (1996) ("Unfortunately, our power to predict future dangerousness seems on a par with our power to predict next months' weather."); Steven G. Gey, *Justice Scalia's Death Penalty*, 20 Fla. St. L. Rev. 67, 118 (1992) ("No jury has the power to ascertain with 100 percent certainty the future actions of the defendant, yet Texas requires the jury to do just that."); Jeffrey L. Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 Wm. & Mary Bill Rts. J. 345, 371-72 (1998) ("the use of the 'future danger' aggravating factor as a tool for determining who receives the death penalty is highly suspect. … Even ignoring the potential unreliability of testimony from mental health professionals, every first-degree murder defendant reasonably could be found to be a future danger because he has been convicted of murder."); Grant Morris, *Defining Dangerousness: Risking A Dangerous Definition*, 10 J. Contemp. Legal Issues 61, 85 (1999) (explaining mental health professionals' "grave doubt" about predictions of dangerousness); Irene Merker Rosenberg, Yale L. Rosenberg & Bentzion S. Turin, *Return of the Stubborn and Rebellious Son: An Independent Sequel on the Prediction of Future Criminality*, 37 Brandeis L.J. 511, 519 (1998-99) ("a substantial body of literature suggests that prophecy of this sort is a very speculative business, resulting in massive inclusion of persons who would not, in fact, engage in the predicted anti-social behavior"); Christopher Slobogin, *Dangerousness and Expertise*, 133 U. Pa. L. Rev. 97, 110-11 (1984) (describing false positive rates as high as 92 percent).

### B.    Evidence demonstrates that Buntion's jury was wrong.

Buntion has committed no violent acts while incarcerated. His impeccable disciplinary record demonstrates that he poses no threat to guards or fellow inmates. The jury's prediction that he posed a future danger has proved to be inaccurate. Because Buntion's sentence is based on a factual inaccuracy, it should be vacated.

In *Johnson v. Mississippi*, 486 U.S. 578 (1988), the jury found an aggravating circumstance based on a defendant's prior conviction; when that conviction was reversed after the death sentence had been imposed, the Court vacated the sentence. In *Johnson*, later developments revealed that Johnson's death sentence was unreliable and arbitrary because it was "predicated, in part, on a … judgment that is not valid now, and was not valid when it was entered…." *Id.* at 585 n.6. Buntion's sentence is also predicated on an assessment that has proved invalid.

Buntion has spent the majority of his adult life in prison, including two decades on death row. Despite having spent nearly forty years of his life in prison, Buntion received very few disciplinary reports during his various incarcerations. Exhibit 2 at paras. 14-20. In the

101

twenty years he spent on death row, Buntion received three minor disciplinary reports. *Id.* at para. 20. Buntion adjusted well to life on death row, first at the Ellis Unit in Huntsville, then at the Polunsky Unit in Livingston. While at the Ellis Unit, Buntion's good behavior meant he was eligible for and participated in a number of prison programs, including working in the prison's garment factory. Though Buntion prefers to work while in prison, he has not had that opportunity since 2000, when death row moved to the Polunsky Unit in Livingston. Buntion has not had any disciplinary reports during his years at the Polunsky Unit. Exhibit 2 at para. 22.

### C.    This claim is exhausted.

Buntion presented this claim to the CCA on direct appeal through his twenty-sixth point of error. The CCA decision reached the merits of the claim in its alternative holding. *Buntion v. State*, 482 S.W.3d 58, 106 (Tex. Crim. App. 2016) ("Further, this Court has rejected similar claims."). This Court should find the CCA's decision on the merits of Buntion's claim involves an unreasonable application of federal law.

**V.    Buntion's death sentence is unconstitutional because his ability to investigate and present mitigation evidence was impeded by the original unconstitutional jury instruction that necessitated his punishment retrial.**

**A.    To impose the death penalty, a jury must be given the opportunity to meaningfully weigh an individual's character and background.**

The Supreme Court has firmly held that an individual determination is central to the process of assigning a death sentence to a defendant.  The Court has noted "[g]iven that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

Juries must specifically be allowed to weigh the personal characteristics of an individual before determining whether the death penalty is warranted. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of

103

the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.”). “For it is only when the jury is given a vehicle for expressing its reasoned moral response to that evidence in rendering its sentencing decision, that we can be sure that the jury has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence.” *Penry v. Johnson*, 532 U.S. 782, 797 (2001) (internal citations and quotations omitted).

In 2001, the Supreme Court held that Texas’ former death penalty statute was unconstitutional during the period when it failed to provide an instruction that gave juries the opportunity to consider and give effect to a defendant’s mitigation evidence. *Id.* Under the former statute, a capital jury answered questions regarding a defendant’s deliberateness and likelihood of committing future violence, but was not asked a question regarding mitigating evidence. Instead, the jurors were given an instruction that indicated the jury should simply answer one of the special issues negatively if they believed a life sentence should be imposed. *Id.* at 797-98. The Supreme Court determined that this “nullification” instruction required a jury to choose between

answering the special issues truthfully or giving effect to mitigation evidence. Thus, the instruction "provided an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence." *Id.* at 800.

> **B.** **The constitutional error that required reversal of Buntion's sentence was not solved by Buntion's punishment retrial, but was instead compounded by the significant time that had elapsed.**

In 2009, eighteen years after his conviction, the CCA reversed Buntion's original conviction because his trial had occurred during the period that Texas's death penalty statute only provided the nullification instruction. *Ex parte Buntion*, 2009 WL 3154909, at *2. Under the precedent from the Supreme Court, the CCA found that this nullification instruction "was not a sufficient vehicle to allow jurors to give meaningful effect to the mitigating evidence presented" at Buntion's 1991 trial. *Id.* The CCA remanded Buntion's case for a new punishment phase trial.

However, this new punishment phase trial did not sufficiently resolve the error created by the unconstitutional former Texas death penalty statute—namely that Buntion was inhibited from investigating

and presenting all potential mitigating evidence for full consideration by his capital jury.

Because of the state of the law in Texas at the time of Buntion's 1991 trial, capital juries were not given an adequate mechanism to consider mitigation evidence presented by the defense. Following the Supreme Court's holding in the *Penry* cases, capital trials gained a renewed focus on the importance of all potential mitigation evidence. Instead of facing a burden of proving to jurors that the weight of mitigation evidence is substantial enough to justify answering their jury charge falsely, capital defense counsel are now able to confidently argue to jurors that any single piece of mitigation evidence may on its own merit be sufficient for a juror to vote for life. Had Buntion's 1991 trial been conducted under current death penalty case law, it is without question that he would have received a significantly different trial. Because of this, Buntion's 1991 trial cannot be viewed as a full and fair assessment of Buntion's character and background.

Further, although Buntion was given a punishment retrial, this occurred more than twenty years after his original trial. By this time, Buntion was no longer in the same position he would have been had he

been able to present a full and fair mitigation case for the jury's consideration in 1991. Instead, because of the significant passage of time, significant areas of mitigation investigation were foreclosed. Life history records were destroyed and various witnesses either died or became otherwise unavailable. After twenty years sitting on death row, with limited contact with family, friends, or the outside world, no defendant could expect to investigate and present the same type of mitigation evidence that might have been available to them prior to their capital conviction. Fundamentally, through no fault of his own, Buntion was denied a constitutionally fair trial in 1991 and his retrial in 2012 could not place him back in the same position he would have been had his initial trial been constitutionally sound. It was the structure of the Texas death penalty scheme in 1991 that prevented a full and fair investigation, presentation, and consideration of Buntion's mitigation evidence. Although that error has been corrected through the reversal of Buntion's case, the addition of significant passage of time prevents Buntion from truly remedying the constitutional error. For this reason, his due process rights have been violated. Where, as in this case, a constitutional error at a defendant's original trial prevents the

individualized consideration of a defendant's character and background, and there is significant passage of time, the safeguards of the due process clauses of the Fifth and Fourteenth Amendment demand that the death penalty no longer be allowed as a punishment. As such, Buntion's death sentence should be vacated.

### C.   This Court should find Buntion is entitled to an evidentiary hearing to develop factual support for this claim.

Buntion raised this claim in his state habeas application. In denying relief the CCA held the claim was procedurally defaulted because it should have been presented in direct appeal proceedings. *Ex parte Buntion*, No. WR-22,548-04 (Tex. Crim. App. June 7, 2017). However, this claim is precisely the type of claim that cannot be brought in direct appeal proceedings because it relies on extra-record evidence. Specifically, this claim should rely on the testimony of Buntion's trial attorneys regarding what types of mitigating evidence they were prevented from presenting due to the passage of time.

Buntion was prevented from presenting testimony from his trial attorneys on this issue because the state habeas court failed to abide by the procedures dictated by Article 11.071 of the Texas Code of Criminal

Procedure. Under Article 11.071, the state habeas court can only order affidavits be submitted to resolve factual issues only after it determines there exist controverted, previously unresolved factual issues and convenes a hearing for the purpose of resolving the factual issues. Tex. Code Crim. Proc. art. 11.071 § 9. In Buntion's state habeas proceedings, the state habeas court entered no order designating issues. The State asked the court to order trial counsel give affidavits responding to Buntion's claims that he received ineffective assistance of counsel, and the court granted the State's motion without determining whether any controverted factual issues existed, without convening a hearing, and without giving Buntion an opportunity to develop evidence in support of his claim. This Court should find that the state habeas court's acting in a manner prohibited by Article 11.071 prevented Buntion from developing evidence in support of this claim and that he is therefore entitled to an evidentiary hearing to develop evidence in support of this claim in these proceedings.

## VI.   The penological objectives of the Eighth Amendment cannot be squared with the execution of a prisoner whose cognitive decline leaves him without a memory of the commission of the crime.

As explained above, Buntion suffers from Mild Cognitive Impairment. Because of this, it is highly likely he will soon develop Alzheimer's. If he does, then he could soon reach the point where he has no independent recall of the facts of the offense for which he was convicted; the sequence of events from the offense to his arrest, to his trial or previous legal proceedings in his case; or the name of the victim. If his cognitive functioning were to decline to this level, Buntion would not have a rational understanding of why he faces execution.

In this case, Buntion would fit into the category of prisoners for whom an execution would serve no retributive or deterrent purpose. *Ford v. Wainwright*, 477 U.S. 399, 417 (1986); *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007). Retribution is served where an offense is offset by a punishment expressing society's "moral outrage," *see Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (plurality opinion), but where as a result of a deteriorating medical condition, the person being punished has no memory of the commission of the offense for which he is to be executed, the "moral quality" of that punishment is lessened and unable

to match the outrage over the offense, *Ford*, 477 U.S. at 408.
Retribution is not achieved where "a prisoner's recognition of the
severity of the offense" does not match "the objective of community
vindication." *Panetti*, 551 U.S. at 958.

Nor can executing such a person be justified on the grounds of
deterrence. The Supreme Court made plain in *Ford* that the execution
of an incompetent person "provides no example to others and thus
contributes nothing to whatever deterrence value is intended by capital
punishment." *Ford*, 477 U.S. at 407; *see also Panetti*, 551 U.S. at 958.

## VII.  Because he has been incarcerated on death row for over a quarter of a century, the Eighth Amendment will not permit Buntion's execution.

In his opinion dissenting from the denial of certiorari in *Lackey v.
Texas*, 514 U.S. 1045 (1995), Judge Stevens expressed his doubt that
neither of the two acceptable purposes for the death penalty – i.e.,
retribution and deterrence – are served in the case of a defendant who
has spent a significant period of time under a sentence of death. *Lackey
v. Texas*, 514 U.S. 1045, 1045 (Stevens, J., dissenting from the denial of
certiorari). Since *Lackey*, Justice Breyer has repeatedly assert his belief
that the Court should review this aspect of Eighth Amendment law.

*See, e.g.*, *Conner v. Sellers*, 136 S. Ct. 2440, 2441 (2016) (Breyer, J., dissenting from the denial of certiorari); *Valle v. Florida*, 132 S. Ct. 1 (2011) (Breyer, J., dissenting from the denial of certiorari); *Smith v. Arizona*, 552 U.S. 985 (2007) (Breyer, J., dissenting from the denial of certiorari).

As a defendant's time on death row lengthens, the justification for the imposition of the death penalty weakens, and the Eighth Amendment concerns grow. *See Lackey*, 514 U.S. at 1045 (suggesting that a 17-year delay in execution would not have been acceptable to the Framers, nor would execution after such delay serve the societal purposes of retribution and deterrence); *see also Gregg v. Georgia*, 428 U.S. 153, 177, 182-83 (1976) (cautioning that any criminal sanction imposed "cannot be so totally without penological justification that it results in the gratuitous infliction of suffering"); *Furman v. Georgia*, 408 U.S. 238, 312 (1972) (White, J., concurring) (noting that when the death penalty ceases to further the social purposes of retribution and deterrence, "its imposition would then be the pointless and needless extinction of life" and the death penalty "would be patently excessive and unusual punishment violative of the Eighth Amendment"). Further,

execution after extraordinary delay is especially cruel when the cause of delay is a defendant's meritorious exercise of his constitutional rights. *See Ellege v. Florida*, 525 U.S. 944 (1988) (Breyer, J., dissenting from the denial of certiorari) (concluding that execution after imprisonment for 23 years under a sentence of death may be cruel in light of the fact that the delays were not because of defendant's frivolous appeals, but rather due in large part to his successful litigation).

The Eighth Amendment prohibition on cruel and unusual punishment draws the constitutional line of acceptable punishments at "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958). The death penalty cannot become "the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Furman*, 408 U.S. at 312.

For twenty-seven years, Buntion has faced the anxiety and uncertainty of a death sentence. He has had first his conviction and then his sentence reversed, only to have his conviction reinstated and to

113

be re-sentenced to death. After this delay, none of the purposes of the

Eighth Amendment would be served by Buntion's execution.

## Conclusion and Prayer for Relief

WHEREFORE, Petitioner Carl Buntion prays that this Court:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional sentence of death;

2. If necessary to resolve disputed factual issues, schedule an evidentiary hearing during which Buntion may present evidence in support of his claims;

3. Grant such other relief as law and justice require.

Respectfully submitted,


s/ David R. Dow                          s/ Jeffrey R. Newberry

_____          _____

David R. Dow                             Jeffrey R. Newberry
Texas Bar No. 06064900            Texas Bar No. 24060966
University of Houston                 University of Houston
Law Center                                 Law Center
4604 Calhoun Rd.                       4604 Calhoun Rd.
Houston, Texas 77204-6060      Houston, Texas 77204-6060
Tel. (713) 743-2171                     Tel. (713) 743-6843
Fax (713) 743-2131                     Fax (713) 743-2131


*Counsel to Carl Wayne Bution, Petitioner*

## Verification

I, Jeffrey R. Newberry, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set forth in this Petition are true.

s/ Jeffrey R. Newberry
_____
Jeffrey R. Newberry

## Certificate of Service

I certify that on Thursday, June 7, 2018, a copy of the foregoing pleading was electronically served on counsel for Respondent, George D'Hemecourt, via an email to email to George.d'Hemecourt@oag.texas.gov by the electronic case filing system of the Court.

s/ Jeffrey R. Newberry
_____
Jeffrey R. Newberry