United States District Court
Southern District of Texas
**ENTERED**
March 05, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CARL WAYNE BUNTION, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:17-CV-2683 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM AND ORDER**

Carl Wayne Buntion was convicted and sentenced to death in 1991 for the capital murder of Houston Police Officer James Irby in Harris County, Texas. After the Texas Court of Criminal Appeals ordered a retrial of his punishment, a second sentencing hearing in 2012 resulted in a second death sentence. Buntion unsuccessfully challenged his second death sentence on state appellate and habeas review.

In 2018, Buntion filed a federal petition for a writ of habeas corpus. Respondent Lorie Davis has moved for summary judgment. Having reviewed the record, the pleadings, and the law, the Court grants summary judgment and denies Buntion's federal habeas petition. The Court will not certify any issue for appellate consideration.

**BACKGROUND**

In June 1990, Buntion killed Houston Police Officer James Irby during a traffic stop. The Texas Court of Criminal Appeals has summarized the facts surrounding the murder as follows:

> [Buntion's] victim, James Irby, was a motorcycle police officer who made a traffic stop of a vehicle in which [Buntion] was a passenger. While Irby and the vehicle's driver were standing and talking next to the vehicle, [Buntion] exited the vehicle carrying a loaded gun. [Buntion] shot Irby once in the head, causing him

to fall to the pavement.  While Irby was lying on the ground, [Buntion] shot him twice in the back.

[Buntion] fled the scene on foot and committed several violent offenses during his efforts to evade capture.  [Buntion] attempted to steal a car that was waiting at a stop sign by standing in front of the vehicle and pointing a gun at the driver.  As the driver began to back the car away, [Buntion] fired a shot into the windshield.  The bullet shattered the windshield, sending broken glass into the driver's eyes, and struck the passenger in the arm.  When a peace officer who had come upon the scene commanded [Buntion] to halt, [Buntion] shot at the officer and ran down the street.  [Buntion] then walked into a nearby warehouse, where he pointed his gun at an employee, who ran outside.  [Buntion] chased a second employee into the parking area.  A supervisor who was pulling into the driveway saw [Buntion] and confronted him.  [Buntion] pointed his gun at the supervisor's face and directed him to put his hands up, give [Buntion] his wallet, and get on the ground.  [Buntion] then attempted to steal the supervisor's vehicle.  However, when [Buntion] could not operate the standard transmission, he abandoned the vehicle and ran inside a building, where a responding police officer arrested him.

*Buntion v. State*, 482 S.W.3d 58, 66-67 (Tex. Crim. App. 2016).

A Texas jury convicted Buntion of capital murder and sentenced him to death in January 1991.  The state courts denied Buntion's initial appeal and state habeas application.  In 2006, this Court conditionally granted federal habeas corpus relief on Buntion's claims of judicial bias. *Buntion v. Dretke*, 2006 WL 8453025, at *1 (S.D. Tex. 2006).  The Fifth Circuit reversed. *Buntion v. Quarterman*, 524 F.3d 664, 666 (5th Cir. 2008).  The Supreme Court denied certiorari review.  *Buntion v. Quarterman*, 555 U.S. 1176 (2009).

The decades that had passed since Buntion's conviction had brought changes to the law governing a jury's ability to consider mitigating factors in a capital inmate's life.  In 2009, the Texas Court of Criminal Appeals found that, pursuant to *Penry v. Johnson*, 532 U.S. 782 (2001), the jury instructions in Buntion's trial did not provide a sufficient vehicle for jurors to consider mitigating evidence.  *Ex parte Buntion*, 2009 WL 3154909, at *2 (Tex. Crim. App. 2009).

The trial court held a new punishment hearing in February 2012.  Consistent with Texas law, the jury decided Buntion's fate by answering four special issue questions: (1) did Buntion

commit the murder; (2) was there a probability that Buntion would commit future acts of violence; (3) was Buntion's conduct unreasonable in response to any provocation; and (4) were there mitigating circumstances that warranted a life sentence.

The Court of Criminal Appeals described the State's evidence supporting a death sentence:

> Here, [Buntion's] conduct immediately after his arrest indicated that he lacked remorse for the offense. He refused to give the arresting officer his name or any other information and claimed that he was diabetic and paralyzed. While in the police station following his arrest, [Buntion] was uncooperative and appeared to be "mad at everybody." The jury also heard evidence confirming [Buntion's] continued lack of remorse. During a 2009 recorded interview with a television reporter following the reversal of his initial sentence, [Buntion] stated that his conduct in committing the offense was justified because he had no doubt that the victim was going to shoot him. [Buntion] also stated that if he were faced with the same situation today, he would do it again.
>
> [Buntion's] prior criminal record also supported the finding that [Buntion] posed a continuing threat to society. *See Solomon v. State*, 49 S.W.3d 356, 363 (Tex. Crim. App. 2001) (noting that the existence of a prior criminal record and the severity of the prior crimes is a factor to consider in determining whether a defendant constitutes a continuing threat to society). [Buntion] had thirteen prior felony convictions, many of which involved assaulting other people. Most notably, [Buntion] was convicted in 1965 of "assault to murder" an Alabama peace officer. Further, [Buntion] committed the instant offense a little over a month after he was released to parole while serving a sentence for the offense of sexual assault of a child. *See id.* at 363-64 (stating that committing an offense while on parole has some tendency to show future dangerousness).
>
> In addition, [Buntion] committed numerous unadjudicated extraneous offenses and bad acts, both in and out of prison. During a previous term of imprisonment, [Buntion] was found to be in possession of a shank. While on a prison furlough, [Buntion] used his brother's birth certificate to obtain a visit with his ex-wife, who was in jail. When a jail official discovered [Buntion's] true identity and the fact that he was on a prison furlough, the official arrested [Buntion] and returned him to prison. Approximately a week before the instant offense, [Buntion] showed an acquaintance a gun. He told her that he always carried it because he would rather kill than go back to prison. While in jail for the instant offense, [Buntion] threatened other detainees who asked him why he was there. [Buntion] said that he would kill them "like [he] killed the cop" if they did not leave him alone.

Additional evidence indicated that [Buntion's] character for violence had not changed during his time in prison. *See, e.g., Coble v. State*, 330 S.W.3d 253, 269 (Tex. Crim. App. 2010). While in jail awaiting the punishment retrial, [Buntion] wrote letters to his brother, Bobby. The letters contained language from which a jury could reasonably infer that [Buntion] remained a continuing threat to society. For example, in a July 2011 letter, [Buntion] stated that he was glad that he would never be released from prison because he would "hate to think about what [he would] do to certain people that have screwed [him] around." In an August 2011 letter, [Buntion] advised Bobby that if the district attorney questioned Bobby about Bobby's previous criminal record, Bobby should just say that the district attorney "made [Bobby] what [he was]" by sending Bobby to prison on his first offense instead of giving him probation. "If they create a 'monster,' they should not complain when it feeds (on society,) right? [sic] Right."

Dr. Mark Vigen, [Buntion's] mental health expert, acknowledged that [Buntion] had served "a lifetime of prior prison sentences" before he committed the instant offense. Vigen acknowledged that [Buntion's] criminal history and history of imprisonment could increase the risk for prison violence. Further, the jury had heard evidence that [Buntion] was a member of the Aryan Brotherhood of Texas prison gang. Vigen testified that membership in a prison gang is associated with an increased probability of prison violence. Vigen was also aware that [Buntion] was in his mid-forties at the time he committed the instant offense. He acknowledged that it was anomalous for a person of that age to commit such a violent offense.

*Buntion*, 482 S.W.3d at 67-68.

The defense presented a robust case to secure favorable answers to the special issues. The defense began its case with testimony from Bobby Buntion, Buntion's younger brother, providing context to Buntion's upbringing. Buntion had grown up in a poor and dysfunctional home where his alcoholic father physically beat them several times a week. Buntion ran away from home in his early teens, but his crimes kept him in prison most of his life. Tr. Vol. 39 at 1-45.

Much of the defense's case focused on arguing that Buntion's behavior while in prison proved that he would not be a future danger. The defense called four Texas Department of Criminal Justice guards to discuss Buntion's rule-abiding and non-violent conduct while incarcerated. This included reading prior testimony from a deceased guard who oversaw

Buntion on a prison work program.  Two prison ministers also testified about Buntion's time while incarcerated and described him as a spiritual man with positive attributes.  Tr. Vol. 39 at 303; Tr. Vol. 40 at 141.  The defense then read into the record testimony from two teachers who had testified at Buntion's 1991 trial.  The teachers described Buntion as a good, nonviolent student who participated in and completed college courses during a prior incarceration.  Tr. Vol. 40 at 166, 171.

The defense bolstered its argument that Buntion would not constitute a continuing risk of future violence through the testimony of two expert witnesses.  A former head of the TDCJ classification system testified regarding the classification Buntion would receive if he were given a life sentence.  Tr. Vol. 39 at 180-85.  Because Buntion had been previously identified as a member of the Aryan Brotherhood prison gang, Woods believed that Buntion spend a life sentence in administrative segregation with significant restrictions.  Dr. Mark Vigen, a forensic psychologist, testified about his research into violence among death row inmates.  Tr. Vol. 40 at 24.  As a general rule, Dr. Vigen had found that death row offenders committed fewer violent acts than other inmates in general population.  Tr. Vol. 40 at 48-52.  Dr. Vigen also individualized that evidence by identifying various factors in Buntion's own background that made him less likely to be violent, such as his twenty years without serious incidents on death row, his elderly age, and his intelligence.  Tr. Vol. 40 at 37-48.

The jury answered Texas' special issues in a manner resulting in the imposition of a death sentence.

The Court of Criminal Appeals affirmed Buntion's conviction and sentence in a second appellate action.  *Buntion v. State*, 482 S.W.3d 58, 65 (Tex. Crim. App. 2016).  The Supreme Court denied certiorari review.  *Buntion v. Texas*, 136 S. Ct. 2521 (2016).

Under Texas law, an inmate's state habeas action proceeds concurrent to his direct appeal. Buntion filed a state habeas application raising twelve claims for relief. The trial court entered findings of fact and conclusions of law recommending the denial of relief. State Habeas Record at 535–73. Based on the lower court findings and conclusions, as well as its own review, the Court of Criminal Appeals denied relief. *Ex parte Buntion*, 2017 WL 2464716, at *1 (Tex. Crim. App. 2017).

In 2018, Buntion filed a federal habeas petition raising the following claims:

1.   The trial judge who presided over Buntion's 1991 trial was biased.

2.   Extensive pretrial publicity rendered it impossible for an impartial jury to be seated in Harris County.

3.   Trial counsel's representation violated the Sixth Amendment.

4.   Texas' special issue questions unconstitutionally require the jury to speculate about an inmate's future behavior.

5.   The passage of time since Buntion's initial trial impeded his ability to investigate and present mitigating evidence.

6.   The Eighth Amendment precludes the execution of an inmate who cannot remember committing the offense.

7.   The Eighth Amendment disallows the execution of an inmate who has spent significant time on death row.

Respondent has moved for summary judgment. (Docket Entry No. 17). Buntion has filed a reply. (Docket Entry No. 25). This matter is ripe for adjudication.

## LEGAL STANDARDS

The writ of habeas corpus provides an important, but narrow, examination of an inmate's conviction and sentence. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). How an inmate litigates his claims determines the course of federal habeas adjudication. The exhaustion doctrine precludes federal consideration of any

claim raised for the first time in federal court.  *See* 28 U.S.C. § 2254(b)(1).  As a corollary to

exhaustion, the procedural-bar doctrine requires inmates to litigate their claims in compliance

with state procedural law.  *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*,

520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  A federal court

may review an inmate's unexhausted or procedurally barred claims only if he shows: (1) cause

and actual prejudice; or (2) that "a constitutional violation has 'probably resulted' in the

conviction of one who is 'actually innocent[.]'"  *Haley*, 541 U.S. at 393 (quoting *Murray v.

Carrier*, 477 U.S. 478, 496 (1986)).

     If the inmate has presented his federal constitutional claims to the state courts in a

procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides

for a deferential federal review.  Under AEDPA's rigorous requirements, an inmate may only

secure relief after showing that the state court's rejection of his claim was either "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," or was "based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §

2254(d)(1),(2).

     Inmates arguing legal error in state court decisions must comply with § 2254(d)(1)'s

"contrary to" and "unreasonable application" clauses.  *See Bell v. Cone*, 535 U.S. 685, 694

(2002).  A petitioner does not merit relief by merely showing legal error in the state court's

decision.  *See White v. Woodall*, 572 U.S. 419-20 (2014) (stating being "merely wrong" or in

"clear error" will not suffice for federal relief under AEDPA).  "[F]ocus[ing] on what a state

court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates

to "'show that the state court's ruling on the claim being presented in federal court was so

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 572 U.S. at 420 (quoting *Richter*, 562 U.S. at 103); *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

An inmate's compliance with 28 U.S.C. § 2254(d) does not guarantee habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (observing that no Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]"); *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). A habeas petitioner must still comply with weighty jurisprudential tenets, as the non-retroactivity principle of *Teague v. Lane*, 489 U.S. 288 (1989) that prevents habeas courts from creating new constitutional law.

Respondent moves for summary judgment. Summary judgment is proper when the record shows "that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). AEDPA, however, modifies summary judgment

principles in the habeas context. *See Torres v. Thaler*, 395 F. App'x 101, 106 n.17 (5th Cir. 2010) ("Summary judgement in federal habeas is different than in the average civil case."); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (Rule 56 "applies only to the extent that it does not conflict with the habeas rules"), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004). For example, § 2254(e)(1), mandating that a state court's findings are presumed to be correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the non-movant. *Smith*, 311 F.3d at 668. Unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, a federal court must accept such findings as correct. *See* 28 U.S.C. § 2254(e)(1).

## ANALYSIS

### I.  Biased Jurist

In his first claim, Buntion resurrects his argument that the judge who oversaw his 1991 trial was biased against him. In the federal habeas action challenging his conviction and first death sentence, Buntion claimed that Harris County District Judge William Harmon overtly displayed unconstitutional bias against him. This Court originally granted a conditional writ of habeas corpus on that claim, but the Fifth Circuit reversed after a lengthy discussion of the facts and relevant law.

Buntion now renews that same claim and predicates it on the same facts he presented in the first habeas petition. Buntion provides extensive argument as to why he believes procedural limitations should not preclude a second round of federal review on this issue. Buntion argues that this Court should grant habeas corpus relief because the Fifth Circuit's earlier reasoning was clearly erroneous. Respondent seeks summary judgment and argues that (1) Buntion's claim

violates AEDPA's jurisdictional limitation on adjudicating "[a] claim . . . .that was presented in a prior application," 28 U.S.C. § 2244(b)(1); (2) the Fifth Circuit's review of this claim was correct and thus prevents reconsideration by this Court; and (2) the-law-of-the-case doctrine precludes renewed review.

Cutting through the dense procedural arguments made by both parties, Buntion asks this Court to do something it cannot: reconsider and overrule a decision by the Fifth Circuit. Whether viewing the issue in jurisdictional terms, under AEDPA's successiveness limitations, through the jurisprudential lens of the law-of-the-case doctrine, or by some other theory, the ultimate result is dictated by common sense and basic principles of the law—this Court simply lacks authority to reconsider a decision by the Fifth Circuit, much less declare its reasoning clearly erroneous.    Buntion's arguments to the contrary do not merit serious judicial consideration.

The Court finds that substantive law and procedural requirements preclude Buntion from relitigating the question of his trial judge's bias.   This claim is not worthy of additional discussion and is summarily denied.

## II.    Pretrial Publicity

In his second ground for relief, Buntion claims that pre-trial publicity violated his rights under the Sixth and Fourteenth Amendments.

### A.    Background

Shortly before trial was to commence, the Houston Chronicle printed a front-page newspaper article titled "Death Row Cases Back for Retrial" which was also available on its website.  Clerk's Record at 256.  The February 8, 2011, article discussed several defendants who faced new sentencing hearings because of *Penry* error, and extensively described Buntion's

imminent retrial.  On direct appeal, the Court of Criminal Appeals summarized the article as follows:

> The print version of the February 8 story was titled, "Death Row Cases Back for Retrial." The online version was titled, "Death row inmates get chance at life in retrials."  In both versions of the February 8 story, a sentence in bold-face type underneath the main title referred to a "cop killer" whose sentence could be changed to life. The text identified [Buntion] as a person who had been convicted of "gunning down" a police officer during a traffic stop.  It further described [Buntion's] case as "the highest profile case" among "as many as sixteen" capital murder cases in which Lykos anticipated a punishment retrial following the reversal of the death sentence due to flawed jury instructions.  In the context of arguing against "potentially crippling budget cuts" for the District Attorney's Office, Lykos stated that she intended to pursue the death penalty again in most of those cases.  Lykos explained that, if any of the offenders received a life sentence, "it is possible that the 'early release' parole provisions of the 80s and 90s would result in mandatory parole."  Both versions of the February 8 story included a subheading in bold-face type titled, "Parole board has final say."  The text that followed the subheading explained that the Texas Board of Pardons and Paroles, and not a jury, would determine whether a life-sentenced offender would be released to parole.  The story also quoted a Houston criminal defense attorney, who asserted that Lykos' statement was inaccurate and that, as a practical matter, no Board member would ever vote to release [Buntion] from prison because any member who did so would not be able to keep his job.
>
> The print version of the February 8 story appeared on the front page of the newspaper.  The most prominent story on the front page concerned a crisis in health care funding and featured a large photograph of a doctor standing beside a bedridden patient.  In contrast, the story at issue occupied only a two-column-wide space on the front page, and it did not include any pictures.  The report continued on an inside page with the title, "Trial: Irby's wife calls new trial a 'nightmare.'"  Below this title were small identification photographs (each a half-column's width) of Irby and [Buntion], and a larger photograph (column's width) of Officer Irby's widow and her father embracing.  The online version of the story omitted the inside-page title referring to the quote from Officer Irby's widow and included only the photograph of Officer Irby's widow and her father.

*Buntion*, 482 S.W.3d at 71-72.

Because of this article, Buntion's attorneys filed a motion for a change of venue.  Clerk's Record at 295.  On direct appeal, the Court of Criminal Appeals described Buntion's concerns about the article:

> . . . District Attorney Patricia Lykos had made a statement to the Houston
> Chronicle stating that [Buntion] would be released to "mandatory parole" if he
> received a life sentence.  [Buntion] claimed that Lykos' statement, which was
> published in the Houston Chronicle on February 8, 2011, made it impossible for
> him to receive a fair trial in Harris County and violated his right to due process
> and his Eighth Amendment right to accurate sentencing.
>
> In support of his motion, [Buntion] noted that the Houston Chronicle was the
> "largest circulating daily in the county" and that the story had received more than
> eighty online comments.  He averred that most of these comments were hostile to
> [Buntion], and several of them stated that [Buntion] should receive the death
> penalty so that he could never be released from prison.

*Buntion*, 482 S.W.3d at 70.   In that article, the Harris County District Attorney stated that

"[s]hould any of them receive a life sentence, it is possible that the 'early release' parole

Provisions of the '80s and '90s would result in mandatory parole."  *Id*. at 72.

The newspaper published a story two days later titled "Killer's Defense Wants Retrial

Moved."  Clerk's Record at 262.  The article reported that Buntion's attorneys planned to seek a

change of venue based, in large part, on the district attorney's comments about mandatory

parole.  As summarized by the Court of Criminal Appeals:

> The February 10 follow-up story was titled, "Killer's Defense Wants Trial
> Moved."  In that story, defense counsel said that they were seeking a change of
> venue due to Lykos' prior statement about early release. They asserted that
> Lykos' statement was inaccurate because there was no mandatory release for a
> capital murderer.  They also stated that the Board of Pardons and Paroles would
> never release [Buntion] if he received a life sentence.

*Id.*  The Court of Criminal Appeals observed:

> [Buntion] acknowledged that in a follow-up news story published on February 10,
> 2011, defense counsel pointed out that Lykos' parole statement was incorrect.
> But [Buntion] alleged that defense counsel's statements had not cured the harm.
> [Buntion] noted that the readers' comments that followed this story continued to
> express a preference for [Buntion] receiving the death penalty.
>
> [Buntion] emphasized that Lykos had made this statement just weeks before the
> start of jury selection, so it would be fresh in the minds of prospective jurors.
> [Buntion] averred that he had not wanted to mention parole to the jury at all, but
> based on Lykos' inaccurate statement, he would be compelled to ask potential

jurors whether they had seen the media coverage that referenced parole. [Bunion] noted that this case was already well-known, as shown by the fact that venue for his 1991 trial had been changed due to extensive pretrial publicity.

*Id*. at 70-71.  The article quoted Bunion's attorneys as accusing the district attorney of trying to "pollute the jury panel just a couple weeks before trial[.]" Clerk's Record at 262.  The online version of both articles generated comments which were largely negative toward Bunion.[1]

On March 2, 2011, the trial court held a hearing on the motion to change venue.[2]  The defense asked the trial court to "take judicial notice of the 1990 change-of-venue proceedings that led to the initial trial being moved to Fredericksburg."  *Bunion*, 482 S.W.3d at 72. Additionally, trial counsel submitted into evidence:

- a video interview which Bunion gave following the reversal of his first death sentence which was readily available online;

- "his own affidavit concerning his understanding of the applicable parole law and his inability to receive a fair trial in Harris County";

- affidavits from two attorneys (one of whom serves as his current counsel on federal habeas review) who both opined that the false statements about mandatory parole prejudiced Bunion; and

---

[1]    The Court of Criminal Appeals summarized:

He also presented a print-out of approximately ninety online reader comments responding to that story.  Many of the comments expressed general hostility toward capital murderers and displeasure with the fact that the death sentences had been reversed in so many cases. Several comments expressed frustration that a life sentence did not actually mean life in prison because of the availability of early release.  However, the comments did not differentiate between the mere possibility of early release and "mandatory" early release.

[Bunion] also presented a print-out of online reader comments responding to the February 10 follow-up article.  This article received fewer comments than the first article.  One commentator stated that Lykos was correct and that [Bunion's] defense counsel ("the vermin who represent the cop killer") were lying.  The commentator also said that [Bunion] could be on the street within a very short time if sentenced to life because there had been no life-without-parole option at the time of the offense.  Like the comments to the first article, this comment to the February 10 article did not differentiate between the mere possibility of early release and "mandatory" early release.

*Bunion*, 482 S.W.3d at 72–73.

[2]    The hearing also addressed related motions Bunion had filed to subpoena and sanction Lykos.  The trial court quashed the subpoena and refused to issue sanctions.

- copies of the on-line comments from the two articles.

*Id*. at 72.

The State presented evidence to rebut Buntion's arguments for a change of venue including copies of other "'plain vanilla' news stories" that generated a comparable number of comments as those about Buntion's trial. *Id*. at 73. The State adduced a transcript from a contemporaneous capital trial in which potential jurors not only did not express concern about the comments, many jurors said that they did not read the newspaper at all.

The defense did not call any witnesses in the hearing. The State called two witnesses in opposition to the change-of-venue motion:

> The prosecutor . . . called Terrance Windham to testify about a defendant's ability to get a fair and impartial jury in a widely publicized case. Windham, who had served as a Harris County assistant district attorney since 1989, explained that the original trial in this case had been moved to Fredericksburg. Windham was aware of very little media coverage since the 1991 trial; the only coverage he had seen were the attachments to [Buntion's] motion. Windham opined that [Buntion] could receive a fair trial in Harris County. He stated that the two Houston Chronicle news articles attached to the motion did not constitute "pervasive coverage" of the case. Further, Windham asserted that the articles were merely informational, and not prejudicial or inflammatory. Windham testified that he was unaware of any "dangerous combination" working to deny [Buntion] a fair trial in Harris County.

> On cross-examination, Windham acknowledged that the news media was covering the instant hearing and that he had seen cameras outside the courtroom. Windham stated that he lived in Houston at the time of the 1990 offense and the 1991 trial. He stated that the case received quite a bit of media coverage at that time, but he did not recall the details. Windham stated that a trial involving the capital murder of a police officer would typically be well-covered in the media. Windham anticipated that the punishment retrial would receive additional media coverage as the trial date approached. Windham acknowledged that Lykos' statement in the February 8 story was inaccurate because Texas does not have "mandatory parole." He agreed that capital murderers are not eligible for any type of mandatory release. Windham testified that he did not know how a potential juror would interpret the term "mandatory parole."

The State also called the Montgomery County District Attorney, Brett Ligon. Ligon testified that, as a defense attorney and as a prosecutor, he had handled cases in Harris and Montgomery Counties that had received extensive media coverage. Ligon opined that despite the media coverage, those trials had been fair. Except for the two news articles attached to [Buntion's] motion, Ligon was not aware of any media coverage of this case following the sentence reversal. In his opinion, those articles did not constitute pervasive, prejudicial, or inflammatory coverage. Ligon acknowledged that "mandatory parole" does not exist in Texas and that this term could mislead potential jurors. He pointed out, however, that both the February 8 and February 10 news articles quoted criminal defense attorneys who stated that Lykos' "mandatory parole" statement was inaccurate.

Ligon also stated that he was unaware of any "dangerous combination" working to deny [Buntion] a fair trial in Harris County. Ligon testified that [Buntion] could have a fair trial in Montgomery County if the motion to change venue were granted. However, based on his trial experience in both counties, Ligon thought that it would be a better strategy for the defense to try the case in Harris County rather than Montgomery County.

*Id*. at 73-74.

At the conclusion of the hearing, the trial court made express findings from the bench denying a change of venue. The trial court's findings echoed Texas' statutory requirements: a change of venue may be granted if the defendant establishes either that (1) "[t]here exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial" or (2) "there is a dangerous combination against him instigated by influential persons by reason of which he cannot expect a fair trial." TEX. CODE CRIM. PROC. ANN. art. 1.03(a). The trial court found that Buntion had not established that publicity was so pervasive, prejudicial, or inflammatory that it would preclude him from having a fair trial. Clerk's Record at 231; Tr. Vol.7 at 90-91. The trial court, however, told the defense that it could reurge the motion any time before the jury was selected. Tr. Vol. 7 at 91. Buntion did not ask again for a change of venue.

On direct appeal, Buntion challenged the denial of the change-of-venue motion, as well as the other related motions he had filed. The Court of Criminal Appeals clarified that Buntion "specifically cites the denial of the change of venue motion as an abuse of discretion by the trial court based on the statutory requirements of Article 31.03," but also "address[ed] the statutory requirements of a change of venue motion . . . and . . . [his] due process allegations." *Buntion*, 482 S.W.3d at 70. The Court of Criminal Appeals found that, overall:

> the February 8 news story was accurate and objective. It briefly described the facts of [Buntion's] offense of conviction. It also quoted Officer Irby's widow, who was upset by the prospect of a retrial and the possibility that, if [Buntion] received a life sentence, she and her children might have to go before the Parole Board when his case came up for review. The article clearly explained that the Parole Board would make any release decisions. The story quoted a local defense attorney who stated that, as a practical matter, the Board would never release [Buntion] if he received a life sentence. The February 10 follow-up news story was also accurate and objective. The story merely reported that [Buntion's] counsel was moving for a change of venue as a result of Lykos' misstatement in the first story. The story contained a quote from defense counsel that there was no mandatory parole and that the Board, and not a jury, would decide whether a life-sentenced offender would be released.
>
> . . .
>
> [Buntion] also appears to complain that any discussion in the media of parole or early release denied him a fair trial because defense counsel's preferred strategy was to avoid mentioning the subject of parole during voir dire. This claim is without merit. *See Feldman v. State*, 63 S.W.3d 416, 433–34 (Tex. Crim. App. 2001) finding parole instructions did not cause [Buntion] egregious harm because parole was not an applicable issue in [Buntion's] capital case. The jury in this case was instructed not to consider any possible action of the Board of Pardons and Paroles Division of the Texas Department of Criminal Justice ("TDCJ"), or how long [Buntion] would have to serve to satisfy a life sentence. We presume that jurors disregard parole when they are instructed to do so. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998).
>
> The trial court's decision to deny [Buntion's] motion for change of venue was well within the zone of reasonable disagreement.

*Id*. at 74-75.

### B.    Exhaustion of Remedies

Respondent argues that, while Buntion exhausted similar state-law arguments on state direct appeal, he failed to exhaust the federal dimensions of this claim.  When Buntion briefed this claim on direct appeal, he specifically asked the Court of Criminal Appeals to reverse his conviction based on state law.  Buntion, however, briefed this claim in close conjunction with two others.  When the Court of Criminal Appeals considered this claim on direct appeal, it observed that Buntion "brief[ed] these points together."  *Buntion*, 482 S.W.3d at 69-70.  Still, Respondent asks this Court to parse through the state-court briefing and find that Buntion did not fully exhaust his federal arguments.

The Court, however, finds it unnecessary to decide the question of exhaustion in Respondent's favor.  AEDPA allows for federal courts to deny a federal habeas claim, exhaustion notwithstanding.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  As the Court finds that Buntion completely fails to satisfy his constitutional burden to prove that prejudice tainted his jury pool, the Court need not reach the question of exhaustion.

### C.    Analysis

Buntion bears a heavy burden in alleging that pre-trial publicity tainted the jury pool. The Constitution "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Murphy v. Florida*, 421 U.S. 794, 799-800 (1975).  But that simply does "not mean that criminal cases must 'be submitted to automated jurors existing in complete sterility.'"  *Hale v. United States*, 435 F.2d 737, 745 (5th Cir. 1970) (quoting *Welch v. United States*, 371 F.2d 287, 291 (10th Cir. 1966)).

The Supreme Court has long held that to have an impartial jury, "[i]t is not required . . . that the jurors be totally ignorant of the facts and issues involved" in a case. *Irvin*, 8366 U.S. at 722; *Murphy*, 421 U.S. at 800. Supreme Court precedent "cannot be made to stand for the proposition that juror exposure to news accounts of the crime alone presumptively deprives the defendant of due process" absent a showing that the "trial atmosphere . . . [was] utterly corrupted by press coverage." *Skilling v. United States*, 561 U.S. 358, 380 (2010). The Supreme Court has explained the constitutional standard for reviewing the partiality of jurors exposed to pre-trial publicity as follows:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irwin*, 366 U.S. at 722-23. Therefore, a defendant's constitutional rights are violated if he shows that "the trial atmosphere was 'utterly corrupted by press coverage.'" *Black v. Collins*, 962 F.2d 394, 409 (5th Cir. 1992) (quoting *Dobbert v. Florida*, 432 U.S. 282, 303 (1977)).

Thus, precedent generally requires "a state defendant who seeks habeas relief as a result of pretrial publicity [to] demonstrate an actual, identifiable prejudice on the part of members of the jury that is attributable to . . . publicity." *Willie v. Maggio*, 737 F.2d 1372, 1386 (5th Cir. 1984). A federal petitioner must make two showings to establish actual prejudice: (1) one or more jurors held an opinion, before hearing the trial evidence, that the defendant was guilty and (2) these jurors could not have laid aside their opinions and "render[ed] a verdict based on the

evidence presented in court." *Irvin*, 366 U.S. at 723.  A petitioner makes this showing through the transcript of voir dire examination.  *See Murphy*, 421 U.S. at 800.

Buntion has not shown that pretrial publicity prejudiced the ability to select an impartial jury.  Buntion focuses his argument on criticizing Lykos' statement, both in its intent and veracity.  (Docket Entry No. 4 at 54).  Buntion's argument, however, fails to join issue with the arguments he must make to warrant habeas relief.  Buntion does not provide any citation to the questioning of any prospective juror who demonstrated any improper opinion or bias traceable to the newspaper articles, much less one that the juror could not set aside.  Instead, Buntion presumes that the two news articles prejudiced the defense.  In doing so, Buntion relies on the inaccuracy of Lykos' statement.  Supreme Court precedent focuses on the "blatantly prejudicial" nature of the information, not only on its veracity.  *Skilling*, 561 U.S. at 382.  While Lykos' statement of the law was possibly incorrect, but it was not of a nature that it would be *extremely* prejudicial or inflammatory.[3]

Further, Buntion has made no effort to prove that the two news stories so permeated the community such that the parties were incapable of selecting an unbiased jury.  Nothing in the record hints that the trial atmosphere was "utterly corrupted by press coverage." *Dobbert*, 432

---

[3]    The Supreme Court has recognized a narrow exception to the rule that a petitioner must show prejudice due to pretrial publicity.  In *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Supreme Court held that "where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community,' jury prejudice is presumed and there is no further duty to establish bias." *Mayola*, 623 F.2d 992, 997 (5th Cir. 1980) (explaining *Rideau*); *see also United States v. Lipscomb*, 299 F.3d 303, 344 (5th Cir. 2002).  "Given that virtually every case of any consequence will be the subject of some press attention, however, the *Rideau* principle of presumptive prejudice is only rarely applicable, and is confined to those instances where the petitioner can demonstrate an extreme situation of inflammatory pretrial publicity that literally saturated the community in which his trial was held." *Mayola*, 623 F.2d at 997 (quotation and citations omitted); *see also Rideau*, 373 U.S. at 726 (presuming prejudice when "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality").  A petitioner must show that "the community has become *per se* incapable of yielding an unbiased jury" because of inflammatory and excessive publicity.  *Moore v. Johnson*, 225 F.3d 495, 505 (5th Cir. 2000).  A petitioner must make two showings before a reviewing court will presume prejudice: (1) the pretrial publicity was extremely prejudicial and inflammatory, and (2) the prejudicial pretrial publicity saturated the community where the trial was held.  *See Skilling*, 561 U.S at 380-81; *Rideau*, 373 U.S. at 726-27; *Murphy*, 421 U.S. at 798-99.

U.S. at 303.   The State tried Buntion in a heavily populated area—"more than 4.5 million individuals eligible for jury duty resided in the Houston area"—which, with its "large, diverse pool of potential jurors" makes "the suggestion that 12 impartial individuals could not be empaneled" on the basis of two news articles "hard to sustain." *Skilling*, 561 U.S. at 382.

Simply, Buntion has not shown that his jury was biased or that the circumstances were such that a court must presume that it was.   The Court will deny Buntion's second ground for relief.

## III.   Trial Counsel's Representation

Buntion's third claim argues that trial counsel's representation fell below constitutional expectations.   Buntion points to two areas in which he alleges counsel performed deficiently: (1) allowing an allegedly objectionable juror sit at trial; and (2) in the investigation and presentation of punishment evidence.   A reviewing court must assess counsel's representation under *Strickland*'s two-pronged test: a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).   To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.   The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct," *Wiggins*, 539 U.S. at 521, but instead "measure[s] . . . attorney performance" for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.   This "highly deferential" review eliminates "the distorting effect of hindsight" by looking at "counsel's challenged conduct on the facts of the particular

case, viewed as of the time of counsel's conduct." *Id.*

Before turning to Buntion's specific arguments, the Court makes two general observations about counsel's efforts in this case. First, counsel brought rich experience to Buntion's trial. The same counsel represented Buntion during both his 1991 and 2012 trials. Counsel's experience not only provided fulsome awareness of the factual issues and legal concerns, counsel intimately knew what had worked, and what had not, in the first trial. Counsel's deep knowledge of the case provided a foundation for developing strategy and making tactical decisions.

Second, the Court observes that Buntion exhausted his *Strickland* arguments in state court. *Strickland* claims traditionally afford wide deference to the decisions and actions of defense counsel; under AEDPA this deference is doubly so. Under Section 2254(d), "the question is not whether counsel's actions were reasonable"; the question is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

### A.      Allowing Juror Kotsatos to Sit on the Jury

Buntion's first *Strickland* argument faults trial counsel for not seeking to remove prospective juror Kristi Kotsatos from the jury panel. Juror Kotsatos reported in her questionnaire and voir dire examination that her ex-boyfriend had been murdered almost nine years before. She attended the resulting trial. As a result, Juror Kotsatos suffered bouts of clinical depression. The Court of Criminal Appeals summarized her concerns:

> She stated that, although they were no longer dating and she was not present at the time of the offense, she did not handle the aftermath of the murder very well. As a result of the experience, including sitting through the murder trial, Kotsatos failed some of her college courses and suffered from clinical depression. She asserted that, although nine years had passed since this trauma, she did not wish to

be a juror in this case because she would probably be so distracted by her past experiences that she would be unable to be fair in her ultimate decision.

*Buntion*, 482 S.W.3d at 68-69.

Juror Kotsatos was the first juror selected after four days of individual voir dire.  Up to that point, trial counsel had actively participated in jury selection: "trial counsel lodged nine challenges for cause prior to accepting Kotsatos as a juror; and, . . . six of the challenges were successful."  State Habeas Record at 554.  Juror Kotsatos' voir dire examination presented some concern for the defense.  "In response to the prosecutor's questions about the effect of her ex-boyfriend's murder, Kotsatos stated that she would probably be distracted, and her past experience might cause her to have a bias or prejudice against the State or the defense."  State Habeas Record at 555.

Still, Juror Kotsatos' answers in the jury questionnaire displayed traits that would make her a good juror for the defense.  As the state court summarized on habeas review:

> she considered herself a liberal and a leader; that she had reservations about the criminal justice system and the death penalty; that it seemed "a lot of innocence ppl [sic] have served jail time" in light of DNA evidence; that she was unsure whether it was her place to send someone there [death penalty]; that she was conflicted about the death penalty; that there "[m]ust be a better alternative;" that it seemed a "little outdated" in 2012; that she thought information about childhood and background was "relevant in regards to how a person turned out;" and, that she might "be too conflicted about sending someone to die.

State Habeas Record at 555.

Trial counsel's voir dire questioning reinforced Juror Kotsatos' ability to serve: "Kotsatos expressed doubts about the death penalty, exhibited a willingness to answer the special issues so that [Buntion] would receive a life sentence if appropriate, indicated that she would not lean toward the death penalty based on the facts of the primary offense, and stated, 'I think there could be a lot of mitigating circumstances.'"  State Habeas Record at 555.  Juror Kotsatos

expressed concerns about giving a death sentence, indicated that the facts of the crime would not require an automatic affirmative answer to the special issues, and said that "some people just make horrible mistakes." She also expressed a willingness to hold the State to its burden on the mitigating special issues. When trial counsel questioned Juror Kotsatos about whether she may have a bias against Buntion, "she acknowledged she might 'lean over backwards' not to let that interfere with [him] getting a fair trial." State Habeas Record at 556.

As one of Buntion's attorneys later expressed in an affidavit, "trial counsel believed Kotsatos to be a 'defense juror' based on her voir dire answers, and that her attempt to remove herself from the jury for psychological reasons 'cemented' their opinion that she would have difficulty rendering a death verdict." State Habeas Record at 556. With that background, the state habeas court found that "trial counsel are not ineffective for choosing not to challenge for cause Kotsatos—a defense-oriented juror based on her juror questionnaire and voir dire examination concerning her view of the death penalty, mitigation, and the criminal justice system." State Habeas Record at 557.

Even though Juror Kotsatos expressed that she did not want to serve, both parties accepted her as a juror. As the trial neared, however, Juror Kotsatos became concerned that she would not be able to serve:

> On February 3rd Kotsatos informed the court coordinator by telephone that she did not feel fit to serve on the jury. The court coordinator informed Kotsatos that she needed to return for jury duty as instructed. On February 7th, Annie McAdams, Kotsatos' sister-in-law and a civil attorney, contacted the court and informed the court by telephone that she believed that Kotsatos' mental state was deteriorating. Based on this phone call with the court, which both the State and the defense witnessed, the court decided to hold a special hearing the next day and question both McAdams and Kotsatos. After the hearing, and after an off-the-record conference among the trial judge and the attorneys for both sides, the court informed Kotsatos that she would remain a juror. Kotsatos did not express any opinion about remaining a juror at that time. The court advised Kotsatos in detail what she should do if at any time during the trial she had further problems or if

she had further concerns about being an impartial juror. The record does not reflect any argument from the defense regarding whether or not Kotsatos should remain a juror. The record does not reflect an unambiguous bias against [Buntion]. In fact, Kotsatos repeatedly replied that she would consider the evidence and follow the law in response to questions about the special issues she would be required to answer as a juror.

*Buntion*, 482 S.W.3d at 69.

Trial counsel did not object to her service as a juror. Accordingly, when Buntion complained on direct appeal that Juror Kotsatos was unfit to serve because of mental instability, the Court of Criminal Appeals found that his argument was defaulted by a lack of a trial objection. *Buntion*, 482 S.W.3d at 70.

On habeas review Buntion also claimed that trial counsel should have Juror Kotsatos. The state habeas court found that "when her questionnaire and *voir dire* examination" were "viewed in its entirety" it showed "that she was a defense-oriented prospective juror: she described herself as liberal; she had doubts about the death penalty; she was willing to answer the special issues so that a life sentence would result; she was open to mitigating circumstances; she would 'lean over backwards' not to let her past experience interfere with [Buntion] getting a fair trial." State Habeas Record at 566. On that basis, the state habeas court explicitly found that "trial counsel are not ineffective for choosing not to challenge for cause Kotsatos—a defense-oriented juror based on her juror questionnaire and voir dire examination concerning her view of the death penalty, mitigation, and the criminal justice system." State Habeas Record at 557.[4]

---

[4]     The state habeas court found that the essence of the *Strickland* claim was the same as the claim he raised on direct review, and thus should be defaulted. State Habeas Record at 565-66. The state habeas court also considered the claim's merits in the alternative. The Court of Criminal Appeals stated simply: "This Court has reviewed the record with respect to the allegations of ineffective assistance of counsel. We deny relief on these claims because [Buntion] has not met his burden under *Strickland v. Washington*, 466 U.S. 668 (1984). He has failed to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." *Ex parte Buntion*, 2017 WL 2464716, at *1 (Tex. Crim. App. 2017). While the Court of Criminal Appeals did not explicitly adopt the lower court's recommendations, it did not reject them either. The Court will presume the lower court findings to be correct and defer to the state court's determination, both on the trial and appellate level, that Buntion's *Strickland* arguments do not merit relief.

Buntion renews his challenge to trial counsel's acceptance of Juror Kotsatos.  Buntion emphases that Juror Kotsatos repeatedly expressed the kind of bias that should have excluded her from jury service.  Buntion contends that "[t]here is no strategic reasoning that would justify keeping a juror who is biased against your client on the jury panel, regardless of her other voir dire answers." (Docket Entry No. 4 at 65-66).  Buntion argues that Juror Kotsatos' service likely prejudiced the defense.

This claim, however, comes before the Court under the "doubly deferential" review afforded *Strickland* claims that have been adjudicated on the merits.  *Pinholster*, 563 U.S. at 190. The state habeas decision deferred to counsel's choice to keep Juror Kotsatos on the jury.  Trial counsel expressed during voir dire that he did not think Juror Kotsatos was biased.  Tr. Vol. 15 at 73.  Both trial attorneys submitted affidavits on state habeas review opining that Kotsatos would be a defense-oriented juror.  State Habeas Record at 357, 361.  In fact, both attorneys believed that any distress she felt would make her less likely to return a death sentence.  While the decision came with some risk, this Court will generally defer to such well-informed, planned, and strategic decisions.  *See Mann v. Scott*, 41 F.3d 968, 984 (5th Cir. 1994) (recognizing that strategic decisions with double-edged consequences are "granted a heavy measure of deference" and "[u]nder an objective standard of reasonableness" do not "constitute deficient performance").

AEDPA adds a second layer to that deference.  The state habeas court considered Buntion's allegations and found no deficient performance or prejudice.  While Buntion's briefing expresses disagreement with the decision, Buntion falls far short of proving that the decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  Under that deferential review, the Court will deny Buntion's first allegation of deficient performance.

### B.      Investigation and Presentation of Mitigating Evidence

Buntion argues that trial counsel failed in their responsibility to investigate and present evidence that would mitigate against a sentence of death.  Having already represented Buntion in one trial, trial counsel went into the punishment phase with a robust knowledge of the challenge they faced defending against a death sentence.  Counsel had a preview of what the State would present and how a jury would respond.   With that experience, the defense presented the following evidence and testimony, as summarized on state habeas review:

> 31. Bobby Joe Buntion, [Buntion's]  brother, testified that [Buntion's] twin brother was killed by the police in 1971; that their mother, Irene, married their father, James, when she was about fifteen years old; that neither parent had received much education; that the family moved to Houston when [Buntion] was about eight years old and lived in a bad area of town; that James worked as a mechanic and often required his children to work for him; that James never encouraged them to attend school; and, that [Buntion] left school after the sixth or seventh grade.

> 32. Bobby Buntion testified that James was a gambler who lost the family home and his tools through gambling; that the family had to move to a rat-infested house; that James was an alcoholic who abused Irene, the children and animals; that James beat Irene with a beer bottle causing her to lose all her teeth; that Bobby and [Buntion] tried to intercede; that Bobby once stabbed James and threatened to kill him if he continued to hit Irene; and, that James never stopped abusing Irene.

> 33. Bobby Buntion testified that James broke his arm in five places when he was nine years old; that James broke [Buntion's] wrist by hitting him with a baseball bat when [Buntion] was eleven or twelve; that Bobby saw James murder a man over a dispute concerning a car repair bill; that James had sex with a pet dog and a pig; and, that neighbors refused to intervene when James abused Irene because they were afraid of him.

> 34. Bobby Buntion testified that he spent twenty to twenty-five years in prison with multiple criminal convictions before his release in 2002; that he had killed two or three men; that he subsequently became religious and lived with his sister who supported him; that he had not seen [Buntion] in over twenty-five years but they wrote each other frequently; and, that he did not consider [Buntion] a violent person.

35. Trial counsel also presented the testimony of S.O. Woods, former director of classifications at TDCJ; Bobby Joe Blanton, TDCJ correctional officer; Wilford Griffin, TDCJ training sergeant; Virgil Miller, TDCJ correctional officer; Earl Hicks; Mark Vigen, psychologist; and, Zeke Young, founder and director of a prison ministry.

36. The Court finds that trial counsel read into evidence the former testimony of Helen Smith, TDCJ correctional officer; Gary Stretcher, Dean of Continuing Education at McLennan Community College; and Jerry Jordan, teacher at McLennan Community College and at a prison unit.

State Habeas Record at 539-40 (citations omitted).

Buntion's federal habeas claim focuses on three areas which he alleges trial counsel should have focused the mitigation defense: (1) evidence regarding his alleged cognitive impairment; (2) individualized evidence allowing the jury to find no propensity for future violence; and (3) evidence relating to gang membership.

1.    Cognitive Impairment

Buntion claims that his trial attorneys should have conducted a neuropsychological evaluation of Buntion because a previous expert had found minimal brain dysfunction in 1991. The defense investigated mental-health concerns and presented testimony through two experts at Buntion's trial in 1991.  Psychologist Wendell Dickerson testified that Buntion did not suffer from mental illness or intellectual disability and had average or above average intelligence.  On cross-examination, Dickerson "denied that [Buntion] suffered from an organic brain syndrome." Although "there was a suggestion of very mild brain dysfunction," Dickenson said that it "did not significantly affect [Buntion]'s judgment or impulse control."  Dickenson did not see any reason to perform any additional tests for organic brain syndrome

Sally Webster, forensic psychologist, also testified for the defense.  Webster testified that Buntion was both competent and sane.   Although Buntion showed "minimal neurological impairment," Webster explained that it "was not excessive or extensive enough to require further

testing." Trial counsel found that Buntion was "helpful in his defense for his 2012 new punishment hearing in recalling facts and witnesses." State Habeas Record at 546. Counsel "saw no signs of dementia." State Habeas Record at 546. Trial counsel consulted with another expert in preparation for the 2012 punishment hearing. The evidence trial counsel adduced through Dr. Mark Vigen to show that Buntion did not present a threat of future dangerousness included that his age of 68 years, his I.Q. of 130, and the college-level courses he took while incarcerated.

On state habeas review, Buntion relied on expert Dr. James Underhill to argue that he suffered from memory problems and functioned far below average in memory. Based on the finding of "minimal brain dysfunction" in 1991, Dr. Underhill would have recommended additional testing. Based on testing in 2014, Dr. Underhill assessed Buntion's current neuropsychological functioning and found that "Buntion suffers from mild memory problems that are associated with a condition known as Mild Cognitive Impairment ('MCI')." (Docket Entry No. 4, Exhibit 3, at 4). While stating that such deficits in memory generally do not "impact daily functioning," Dr. Underhill opined that "MCI is widely regarded as an initial stage along the disease process leading from normal neurological functioning to dementia or dementia of the Alzheimer's type." (Docket Entry No. 4, Exhibit 3, at 5). Dr. Underhill concluded: "At this time, Mr. Buntion is suffering from memory impairments that are atypical for his age. There is a probability that these impairments will increase in severity progressing from mild memory impairments to eventual dementia or severe memory impairments that could result in Mr. Buntion becoming disoriented to date, time, and situation, and unable to properly care for himself." (Docket Entry No. 4 at 7).

The state habeas court found that Dr. Underhill's affidavit was "unpersuasive and speculative." State Habeas Record at 546. The state habeas court found fault with Dr. Underhill for what he did not say:

> Dr. James Underhill did not diagnose [Buntion] with dementia of any type; that Underhill did not conclusively state [Buntion] will develop dementia in the future; and, that Underhill's 2014 evaluation, conducted fourteen years after the offense, in which he finds mild memory problems with [Buntion], does not conclude that such problems existed at the time of the offense or [Buntion's] 1991 trial or his 2012 new punishment hearing and is belied by the expert evidence presented in 1991 and 2012.

State Habeas Record at 546-47. On that basis, the state habeas court found that Buntion failed "to show ineffective assistance of trial counsel based on counsel not requesting a neuropsychological evaluation of [Buntion] in light of the opinions of the two experts retained by trial counsel in 1991 and the opinion of the expert the same trial counsel obtained for the 2012 new punishment hearing." State Habeas Record at 563.

Buntion has not shown that the state court's decision was contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1). Trial counsel had Buntion evaluated in both 1991 and in 2012. While the experts found some minor brain dysfunction, neither expert felt that additional testing was necessary. Trial counsel is entitled to rely on the informed opinion of learned experts. *See Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000) (holding that counsel is entitled to rely on the opinions of their experts and is not required to "canvass[] the field to find a more favorable defense expert"). Buntion has not shown any condition that counsel could have developed at that time.

True, testing performed two years after the second penalty phase showed that Buntion may have some degree of memory loss, but Dr. Underhill does not say that Buntion exhibited any memory problems at the time of either trial. Even in 2014, Dr. Underhill did not diagnose

Buntion with dementia.  Instead, Underhill predicated his diagnosis on the possibility of future memory loss and cognitive decay.  Trial counsel cannot be faulted for not presenting evidence based on speculation or conjecture.

Given trial counsel's efforts to assess whether Buntion suffered any psychological or mental-health conditions that could form the basis of a penalty defense, Buntion has not shown that a reasonable attorney would have done more, much less that not doing so prejuiced the defense.  The Court will deny Buntion's failure-to-present-evidence-of-memory-loss argument.

2.      Future Violence

Buntion claims that trial counsel did not adduce enough evidence to convince jurors to answer the future-dangerousness special issue in his favor.  Buntion bases this claim on an affidavit prepared by Dr. William Kelly, a sociologist who specializes in criminology.  As the result of an interview conducted in 2014, Dr. Kelly concluded that Buntion posed an exceptionally low risk for violating prison rules and assaulting staff.  Dr. Kelly primarily relied on factors such as Buntion's age, poor physical health, socialization, psychological adjustment to incarceration, desire to avoid conflict, positive adjustment to prison life, and institutional behavior.  Dr. Kelly particularly emphasized the generally tendency of inmates to age out of crime, which would be especially relevant to Buntion who is over sixty years old.

Buntion raised this argument on state habeas review and relied on Dr. Kelly's affidavit. The state habeas court denied relief because trial counsel had "effectively presented evidence of the 'aging out' phenomenon of danger decreasing with age; [Buntion's] age of 68, [Buntion's] low number of disciplinary incidents while incarcerated, [Buntion's] successful adjustment to institutional life, [Buntion's] not being a problem in prison, [Buntion's] religious views, [Buntion's] educational endeavors, and [Buntion's] kindness."  State Habeas Record at 562.  The

state habeas court found that Dr. Kelly's testimony would have been cumulative "in the light of the extensive evidence, including the testimony of a psychologist," that trial counsel "presented relevant to the future dangerousness issue."  State Habeas Record at 563.

The state habeas court's decision was not contrary to, or an unreasonable application of, federal law.  Most of Dr. Kelly's opinions are merely cumulative of trial testimony.  Trial counsel's obvious focus in the penalty phase was to show that Buntion would not pose a threat in prison.  Trial counsel used testimony from experts such as S.O. Woods, a former director of classifications at TDCJ, and Dr. Mark Vigen, a psychologist whose research focused on incarcerated individuals, to focus on how Buntion's age, institutional record, and reputation all proved that he would not be violent.  Trial counsel personalized this narrative with testimony from Bobby Blanton, a correctional officer who had almost daily contact with Buntion on death row for many years.  Other witnesses affirmed that Buntion was not a troublemaker, violent, or otherwise problematic as an inmate.  While some features of Dr. Kelly's report were not before the jury, such as Buntion's physical ailments, his opinions largely mirror information already presented by trial counsel.

The jury considered the defense's evidence against the State's strong showing that Buntion had engaged in lifelong, unremitting violence.  Other than the terrible facts of the crime, the State presented evidence of Buntion's many other criminal acts, his bad behavior while in custody, and his lack of remorse.  Dr. Kelly's proposed testimony does not measurably strengthen the defense's case against what the State presented.  Given the generally cumulative nature of Dr. Kelly's conclusions, and in light of the evidence presented at trial, the Court finds that the state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law.

3.      Gang Membership

Buntion claims that trial counsel made insufficient efforts to rebut testimony that he was the member of a prison gang.   The defense called S.O. Woods, former head of the TDCJ classification office, to describe the classification of inmates.   Woods described how Buntion had been identified as being a member of a security threat group, the prison gang Aryan Brotherhood.   Tr. Vol. 39 at 184.   Woods explained that because of Buntion's classification as belonging to the Aryan Brotherhood, he would be on "lockdown, maximum custody" (also known as administrative segregation) even if he received a life sentence.   Tr. Vol. 39 at 184.   On cross-examination, the State asked Woods questions about the racist views and criminal acts of the Aryan Brotherhood.   The State emphasized that the dangerousness of the group, and its skill at hiding illegal activities, which caused its members to be segregated from the general population.   Tr. Vol. 39 at 192-93.   The State also presented evidence that Buntion had used gang terminology in letters to his brother.

Buntion first questions trial counsel's strategy in adducing Wood's double-edged testimony: it showed that Buntion would be non-violent in a controlled environment, but also suggested that his own violence necessitated that security.   Buntion also wishes that trial counsel had effectively countered evidence about Buntion's gang membership.   Buntion specifically faults counsel from not calling other inmates who, while not able to say that Buntion had never been a member of the Aryan Brotherhood, would testify that he was not an active member of the group.   Also, the inmates could say that Buntion generally had a good character and did not espouse racist views common to members of the Aryan Brotherhood.

Trial counsel presented Wood's testimony to counter the State's argument that Buntion would "roam freely" in prison if given a life sentence.   Tr. Vol. 35 at 33-34.   Wood's testimony,

however, came with risks.  Showing that a life sentence would mean housing in the controlled setting of administrative segregation ran the risk of revealing why Buntion required such a restrictive classification.  Trial counsel made efforts to minimize the effect of that decision, such as "presenting evidence that [Buntion's] name was not on a recovered list of members of the Aryan Brotherhood; that [he] did not use Aryan Brotherhood type language or threats; that gang-related items were not found in his cell; that [he] did not create problems for correctional officers; and, that he did not have a reputation for assaultive behavior."  State Habeas Record at 563.  In the end, trial counsel made a strategic decision and, knowing the effects that would flow therefrom, made efforts to mitigate the prejudicial consequences of that decision.  While Buntion has pointed to areas in which counsel could have bolstered the defense, he has not shown that the state habeas court was unreasonable in finding that counsel's efforts in that regard were not deficient or that it resulted in prejudice.  The Court will deny Buntion's *Strickland* claim relating to gang membership.

### C.      Cumulative Effective of Counsel's Representation

Buntion concludes his *Strickland* claim by arguing: "If this Court believes each of trial counsel's errors standing alone is insufficient to find Buntion was prejudiced, the Court should consider the cumulative effect of the errors and find that Buntion was prejudiced by trial counsel's deficiencies."  (Docket Entry No. 4 at 91-92).  The Court has found no error in counsel's representation, particularly considering the deferential standards of *Strickland* and AEDPA.  Where, as here, a petitioner has failed to show that his counsel was ineffective in any respect, "there is nothing to cumulate."  *Villaneuva v. Stephens*, 555 F. App'x 300, 308 (5th Cir. 2014); *see also United States v. Thomas*, 724 F.3d 632, 648 (5th Cir. 2013) ("[T]here is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively

Case 4:17-cv-02683   Document 26   Filed on 03/05/20 in TXSD   Page 34 of 40


unreasonable can somehow cumulate to meet the high burden set forth in *Strickland*.").
Buntion's *Strickland* claim is denied.

## IV.    A Jury's Prediction of Future Behavior

Texas' special issue questions require a jury to determine whether an inmate will pose a
future societal threat.  In this case, Buntion's jury had to answer: "Do you find from the evidence
beyond a reasonable doubt there is a probability that the defendant Carl Wayne Buntion would
commit criminal acts of violence that would constitute a continuing threat to society?"  Clerk's
Record at 1306.  Buntion argues that Texas' use of this question in capital sentencing is arbitrary
and causes unreliable speculation.  Buntion supports his argument with social science research,
such as an "an actuarial study of Texas inmates convicted of capital murder found that the
expected rates of violence would be very low for a prisoner convicted of capital murder serving a
life sentence with an average duration of forty years."  (Docket Entry No. 4 at 93).   Further,
Buntion argues that his lawfulness while incarcerated proves that his jury was wrong in finding
that he would be a future danger.

Respondent argues that this claim is procedurally barred.  When Buntion raised the claim
on direct appeal, the Court of Criminal Appeals found that Buntion had "not provided a citation
to the record showing where he presented his claim to the trial court" and, "[t]herefore, his claim
is inadequately briefed."  *Buntion*, 482 S.W.3d at 106 (citing TEX. R. APP. P. 38.1(i)).  The Fifth
Circuit has found that the Court of Criminal Appeals "regularly rejects claims—both on direct
and postconviction review—on the basis that these claims are inadequately briefed."  *Roberts v.
Thaler*, 681 F.3d 597, 607 (5th Cir. 2012).  That default results in a procedural bar of federal
review. *See id*.  Buntion does not show cause or prejudice to overcome the procedural bar.


34 / 40

In the alternative, the Court of Criminal Appeals adjudicated the merits when it found that it "has rejected similar claims." *Buntion*, 482 S.W.3d at 106. Buntion has not provided any case in which the Supreme Court has precluded a jury from assessing a defendant's future risk of committing violent acts. To the contrary, the Supreme Court "has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994). "It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made." *Jurek v. Texas*, 428 U.S. 262, 274-75 (1976). Essentially,

> [t]he task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced.

*Jurek*, 428 U.S. at 275-76. As "the likelihood of a defendant committing further crimes is a constitutionally acceptable criterion for imposing the death penalty," *Barefoot v. Estelle*, 463 U.S. 880, 896 (1983), Buntion's constitutional challenge lacks merit. The Court of Criminal Appeals' alternative rejection of Buntion's constitutional arguments was not contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1).

Buntion's briefing invites the Court to find that the jury made an incorrect decision when finding that he would be a future danger. Respondent contends that Buntion did not exhaust this portion of his claim (Docket Entry No. 17 at 135-38) and Buntion argues that an attempt to raise the claim in successive state habeas action "would not necessarily be futile." (Docket Entry No. 25 at 25-26). Whether or not Buntion fully exhausted this argument, however, the Court denies that argument because it lacks merit. *See* 28 U.S.C. § 2254(b)(3) (allowing a federal court to

deny meritless unexhausted claims).   Buntion's briefing on the issue falls far short of the requirement under *Jackson v. Virginia*, 443 U.S. 307, 323 (1979) to show that insufficient evidence supported the jury's answer to that special issue.  This Court must defer to the appellate finding that "[t]he evidence was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that there was a probability that [Buntion] would commit criminal acts of violence that would constitute a continuing threat to society."  *Buntion*, 482 S.W.3d at 68.  The Court of Criminal Appeals emphasized (1) the facts of the underlying offense, which "alone were sufficient to establish [Buntion's] future dangerousness," (2) his other violent acts, (3) his criminal record, and (4) his lack of remorse years after the murder.  *Id*. at 66.  Buntion does not show that the Court of Criminal Appeals' assessment of the facts was unreasonable or wrong.

Insofar as Buntion claims that his non-violence since his second death sentence proves that the jury erred in assessing his future threat, "the Supreme Court has never held that a death-row inmate is entitled to another future dangerousness determination several years after his sentencing."  *Bible v. Stephens*, 640 F. App'x 350, 355 (5th Cir. 2016) (quotation omitted).  Buntion's argument that he is not a future danger is without merit.

## V.    Ability to Develop a Mitigation Case

Buntion argues that constitutional error permeated his resentencing because the passage of time impaired or prevented him from developing a full mitigation case.  Reaching back to his first trial, Buntion argues that the flawed jury instructions precluded his attorneys from presenting a full and fair view into his character and his mitigating circumstances.  According to Buntion, that incomplete mitigation case echoed into his retrial because the passage of years eroded or foreclosed developing previously uninvestigated mitigating avenues.  Buntion argues

that time decayed or destroyed his ability to craft a mitigation defense when he was retried in 2012.

When Buntion raised this claim on state habeas review, the Court of Criminal Appeals found that Buntion defaulted it by not "raise[ing] [it] on direct appeal." *Ex parte Buntion*, 2017 WL 2464716, at *1 (citing *Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004)). Texas law has long held record-based claims not raised on direct appeal are not available for consideration in habeas proceedings. *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996). "[T]he *Gardner* rule set forth an adequate state ground capable of barring federal habeas review." *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004); *see also Rachal v. Quarterman*, 265 F. App'x 371, 377 (5th Cir. 2008); *Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007). The state habeas court's procedural ruling bars federal review.

Alternatively, Buntion's claim lacks constitutional foundation. The Supreme Court has never held that the passage of time prevents retrial or a new sentencing after a court grants habeas relief. The law ensures that a defendant will have the opportunity to present, in an effective manner, testimony and evidence to mitigate against a sentence of death. The Supreme Court, however, has never held that the time itself may render a retrial or resentencing bereft of that opportunity. *Teague* prevents this Court from creating that constitutional right on habeas review.

The Court also observes that Buntion has not shown that the circumstances for creating that new law are present in this case. Aside from making broad pronouncements speculating that time has foreclosed a full mitigation investigation, Buntion provides no specific details about what mitigating themes were suppressed, which witnesses were unavailable or dead, or what

evidence no longer remained viable.   Buntion's speculative statements about unavailable mitigating evidence cannot serve as the basis for creating constitutional law.

## VI.    The Eighth Amendment and Memory

Buntion presents evidence that he suffers from Mild Cognitive Impairment and will likely soon develop Alzheimer's.   Anticipating that he may "reach the point where he has no independent recall of the facts of the offense for which he was convicted; the sequence of events from the offense to his arrest, to his trial or previous legal proceedings in his case; or the name of the victim," Buntion argues that he will soon "fit into the category of prisoners for whom an execution would serve no retributive or deterrent purpose."   (Docket Entry No. 4 at 110). Buntion, however, does not allege that he now suffers from any mental condition that currently impairs his memory of the offense.   To the extent that Buntion claims that he will be incompetent to be executed because of possible future memory decay, his claim is premature.   Buntion must bring this claim when his execution is imminent, and he displays impairment that would support a claim of incompetency.

## VII.    The Eighth Amendment and Time

Buntion's final claim argues that the Eighth Amendment prohibits a State from carrying out a death sentence many, many years after trial.   The Supreme Court has never held that the Eighth Amendment imposes a duty to execute a death sentence expeditiously.   *See Reed v. Quarterman*, 504 F.3d 465, 488 (5th Cir. 2007); *Lackey v. Johnson*, 83 F.3d 116, 117 (5th Cir. 1996); *White v. Johnson*, 79 F.3d 432, 439-40 (5th Cir. 1996).   The non-retroactivity principle from *Teague* prevents this Court from creating that law.   The Court will deny habeas relief on Buntion's final claim.

## CERTIFICATE OF APPEALABILITY

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA").  *See* 28 U.S.C. § 2253(c).  Buntion has not yet requested that this Court grant him a COA, though this Court can consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).   "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal."  *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  The Fifth Circuit, however, anticipates that a court will resolve any questions about a COA in the death-row inmate's favor.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).  The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its

procedural ruling.  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  Unless the prisoner meets the COA standard, "no appeal would be warranted."  *Slack*, 529 U.S. at 484.

Having considered the merits of Buntion's petition, and considering AEDPA's standards and controlling precedent, this Court determines that a COA should not issue.

## CONCLUSION

The Court **GRANTS** Respondent's motion for summary judgment and **DENIES** Buntion's federal petition for a writ of habeas corpus.  The Court **DISMISSES** this case **WITH PREJUDICE**.  The Court will not certify any issue for appellate review.

It is so ORDERED.

SIGNED on this 5th day of March, 2020.

_____
Kenneth M. Hoyt
United States District Judge